G. T. FLAMMIA, Plaintiff,

v.

MITE CORPORATION and O. S. G. Tap and Die, Inc., Defendants.

No. 73 Civ. 1571.

United States District Court,
E. D. New York.

Oct. 6, 1975.

Gaylor & Hampton, Lynbrook, N. Y., for plaintiff.

Cleary, Gottlieb, Steen & Hamilton, New York City, for defendants.

## OPINION

PLATT, District Judge.

### Statement of Facts

Plaintiff seeks compensation for services allegedly performed for the defendants, Mite Corporation ("Mite") and O. S. G. Tap and Die, Inc. ("O. S. G."), in connection with the purchase by O. S. G. of a Mite subsidiary, the Sossner Tap & Tool Corporation ("Sossner"). The demand for such services is $200,000 (an amount equivalent to 10% of the purchase price). Plaintiff in his complaint asked in state court for remuneration on the basis of implied contract and *quantum meruit*. The action was removed to this Court on diversity grounds.

Both defendants have moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure and have submitted statements of uncontested facts pursuant to Rule 9(g) of the Eastern District Rules. The defendants ground their requests on the Statute of Frauds of New York (New York General Obligations Law 5–701(10)) suggesting, that the Statute bars suits for finder's fees due under alleged oral agreements. Plaintiff, seeking partial sum-

mary judgment, asks the court to strike defenses three and four of Mite, and defenses three, four, and five of O. S. G. Defenses three and four in the answers of both defendants are defenses under the Statutes of Frauds of New York and Illinois. O. S. G.'s fifth defense claims that New York Real Property Law § 442–d, barring actions by unlicensed real estate brokers for services tendered pursuant to real estate sales, applies under the facts of this case.

There is no dispute as to the following material facts. Plaintiff is a resident of New York and has been so continuously since 1948. Sossner, a company which manufactures taps, is a New York corporation whose only facilities are located in New York. Plaintiff is a former employee of Sossner. He served as a plant manager, and acquired a stock interest in the company in 1952. In 1960, he became Sossner's Vice President. In 1967, when plaintiff was President of Sossner, Helicoil Corporation acquired the company and plaintiff's stock interest.

In 1970, Mite, a Delaware corporation with its principal place of business in Connecticut, acquired Helicoil, including the Sossner subsidiary. Plaintiff continued as President at an annual salary of $35,000 until March 5, 1973, when he resigned because of policy disagreements with Mite. Prior to his resignation, plaintiff made an unsuccessful attempt to purchase Sossner from Mite. When this effort failed, plaintiff established his own tap manufacturing company, Pioneer Tap & Tool Corporation ("Pioneer").

On May 14, 1973, plaintiff, while attending a convention in Chicago, Illinois, visited the offices of O. S. G. in Elmhurst to inquire about the possibility of O. S. G. supplying semi-finished taps to Pioneer for further finishing and resale. During the course of the day, plaintiff had general discussions concerning the tool cutting business with O. S. G. personnel, among whom were Robert Zoppelt, President, and Terry Osawa, Vice President of O. S. G.

After lunch on that same day, plaintiff, having "sensed the idea that O. S. G. was looking for some sort of expansion in the United States", brought up the subject of Sossner. During the ensuing conversation, O. S. G. personnel discussed the possibility of investigating the availability of Sossner for purchase. Plaintiff indicated that he would be willing to contribute 5% of the estimated purchase price of $2,000,000 and to serve as President of Sossner if Sossner should be acquired by O. S. G. Plaintiff then suggested that before they discussed the matter further he should find out whether Sossner was actually for sale.

At this point, plaintiff placed a telephone call from the O. S. G. offices to Mr. Leo Brancato, Executive Vice President of Mite, at Mite's Connecticut office. Mr. Brancato was not in, but by late that afternoon plaintiff, still in Illinois, was able to reach Mr. Brancato in Connecticut. The plaintiff told Mr. Brancato that he knew of a company that might be interested in Sossner and asked whether the company was for sale. Mr. Brancato indicated that Mite was not actively seeking a buyer for Sossner but that he would nevertheless mull the matter over.

On May 16, 1973, plaintiff, apparently still in Illinois, telephoned Mr. Brancato to inquire further about Mite's plans for Sossner. Mr. Brancato indicated that he had not given the matter much thought and that it "remained indefinite in his mind". During the course of the conversation, plaintiff told Mr. Brancato that O. S. G. was the interested party, and that he had been authorized to say so by Mr. Zoppelt.

On May 17, 1973, plaintiff returned to his home in New York and wrote two letters, one to Mr. Osawa at O. S. G. and one to Mr. Brancato at Mite. In his letter to Mr. Osawa, plaintiff indicated that he had spoken to Mr. Brancato on

May 16th and had revealed O. S. G. as the party interested in Sossner. He also told Osawa of Mr. Brancato's statement that he would mull over the possibility of selling Sossner. Plaintiff's letter to Mr. Brancato advised him to consider seriously the possibility of selling Sossner to O. S. G.

On May 24, 1973, plaintiff, again in New York, called Mr. Brancato to check on Mite's position with respect to a possible sale. On the same day, Mr. Zoppelt wrote a letter to the plaintiff at his New York residence expressing an interest in Sossner, informing plaintiff that O. S. G. could handle the deal financially, indicating that Mr. Osawa's father (an expert in the tool cutting industry) would probably want to visit the Sossner facility and most importantly, thanking plaintiff for "making contact at Sossner" and saying that he looked forward to "hearing the results of your discussions with him (Brancato) on May 23 or 24."

Between May 24, 1973 and June 2, 1973, plaintiff communicated with Mr. Zoppelt three times. On May 29, 1973 and June 2, 1973, plaintiff made telephone calls from New York to Mr. Zoppelt at O. S. G. The purpose of these calls was to inquire how the discussions between O. S. G. and Mite were proceeding. The third communication was a letter dated June 2, 1973 from the plaintiff in New York to Mr. Zoppelt in which the plaintiff indicated that "rather than confuse the possible deal", he would delay his decision to begin the marketing or manufacturing of tools by his own corporation under the Pioneer name.

Plaintiff's next contact with either defendant was a letter dated June 4, 1973, written in New York and addressed to Mr. Brancato in Danbury, Connecticut. This letter suggested that if Mite and O.

S. G. should consummate a deal for the sale of Sossner, plaintiff would be entitled to a finder's fee. Mr. Brancato responded to this claim in his letter of June 6, 1973, addressed to the plaintiff, wherein he flatly stated that Mite never authorized the plaintiff to act on its behalf, and that plaintiff would have to look to the buyer for any possible finder's fee. On receipt of Mr. Brancato's letter, plaintiff telephoned Mr. Brancato in Connecticut from his New York residence. Mr. Brancato reiterated that Mite would not pay any finder's fee and that if plaintiff expected any fee he should look to the buyer.

However, the plaintiff at no time before bringing this lawsuit notified O. S. G. that he expected a finder's fee from them. Rather, his plan was to participate with O. S. G. in the corporate acquisition, obtaining a 5% interest in Sossner and serving as its president after the transaction was consummated.*

On June 12, 1973, Messrs. Zoppelt and Osawa came to New York to meet with the plaintiff and visit the Sossner manufacturing facility. During that trip Messrs. Zoppelt and Osawa had conversations with the plaintiff at his New York residence and asked the plaintiff to prepare a memorandum setting forth his proposal for employment at Sossner in the event that Sossner was purchased. Plaintiff prepared his memo and delivered it to Mr. Zoppelt at the latter's hotel in New York. Plaintiff proposed terms which were found completely unacceptable by O. S. G. officers.

Fearing that O. S. G. and the plaintiff would not come to terms about his participation in the project, Mr. Zoppelt considered the possibility of asking Warren Demory, plaintiff's successor as president of Sossner and at that time an employee of Mite, to remain with Sossner if the purchase was consummated.

---

* Plaintiff was candid in discussing his motivation for making the introduction of O.S.G. to Mite; in response to the question, "Had you had a discussion about a finder's fee with them [O.S.G.] before that [June 7, 1973]?", plaintiff replied, "No, my finder's fee was the fact I was going to go to work there and do exactly what I wanted, I guess, all the time." (Flammia dep. p. 27).

Mr. Zoppelt discussed this with Mr. Brancato and was told that Demory would be free to consider an offer from O. S. G. Mr. Demory eventually was hired as Executive Vice President of Sossner.

The negotiations between Mite and O. S. G. proceeded rapidly. From mid-May to the end of June, Messrs. Zoppelt and Brancato were in touch by phone regularly about the proposed transaction. In addition, Mr. Brancato sent a letter dated May 30, 1973, to Mr. Zoppelt which provided O. S. G. with financial information about Sossner.

On June 27, 1973 representatives of O. S. G. and their attorneys met with representatives of Mite and their attorneys in New York. At this meeting the negotiations were virtually completed and a letter of intent was signed by both parties.

On July 2, 1973, Mr. Zoppelt wrote a letter addressed to the plaintiff at his New York residence again offering plaintiff a position at Sossner on the condition that plaintiff serve as Vice President in charge of manufacturing (reporting to Mr. Demory) at a salary of $30,000 per year. Provisions were made for an automobile, an appropriate expense account, and participation in the management and profit sharing program. Mr. Demory informed the plaintiff on July 6 in New York that the period of his contract of employment would be one year. Plaintiff told Mr. Demory that a one year contract would not work out and rejected the O. S. G. offer.

By letter dated July 13, 1973, Mr. Demory confirmed the plaintiff's rejection of July 6. Mr. Zoppelt expressed his regrets that the plaintiff could not come to an agreement with O. S. G. on terms of employment in a similar letter dated July 17, 1973.

On August 1, 1973, a stock purchase agreement was signed by representatives of Mite and O. S. G. whereby O. S. G. purchased Sossner from Mite.

## I

### Defense Motion for Summary Judgment

Defendants Mite and O. S. G. move for summary judgment under New York's Statute of Frauds. In pertinent part, General Obligations Law § 5–701 provides that

"Every agreement, promise or undertaking is void, unless it or some note or memorandum thereof be in writing, and subscribed by the party to be charged therewith, or by his lawful agent, if such agreement, promise or undertaking:

\* \* \* \* \* \*

"10. Is a contract to pay compensation for services rendered in negotiating a loan, or in negotiating the purchase, sale, exchange, renting or leasing of any real estate or interest therein, or of a business opportunity, business, its good will, inventory, fixtures or an interest therein, including a majority of the voting stock interest in a corporation and including the creating of a partnership interest. 'Negotiating' includes procuring an introduction to a party to the transaction or assisting in the negotiation or consummation of the transaction. This provision shall apply to a contract implied in fact or in law to pay reasonable compensation but shall not apply to a contract to pay compensation to an auctioneer, an attorney at law, or a duly licensed real estate broker or real estate salesman."

### A. The Joint Venture Theory

Before discussing the effect of these provisions on this action, the Court will consider the argument introduced by plaintiff's counsel in response to defendant's claim that the Statute bars this action. Counsel suggests that § 5–701, which on its face applies where recovery is sought under an oral finder's or broker's contract, is inapplicable because plaintiff's contract is a joint venture contract. Plaintiff and O. S. G., it is said, agreed to conduct a joint venture

which had as its object the acquisition and operation of Sossner. In assessing this argument, we will treat it as a motion to amend plaintiff's complaint.

### 1. *The Choice of Law Question*

We begin by determining which State's law is controlling as to the existence or non-existence of a joint venture contract. The contract is alleged to have been made between a New York and an Illinois resident (plaintiff and O. S. G.). Its object was the purchase of a subsidiary of Mite, a Delaware corporation with its principal place of business in Connecticut. The subsidiary, Sossner, is a New York corporation, with its only offices and manufacturing facilities in New York. The place where the contract was allegedly made was Illinois.

In deciding this choice of law issue, we apply the conflicts principles established by New York case law.

New York utilizes the "interest analysis" approach to choice of law problems. *Auten v. Auten*, 308 N.Y. 155, 124 N.E.2d 99 (1954). That is, the forum is to apply the law of the jurisdiction with the most interest in the problem and the most concern in the outcome of the particular litigation. Our question thus becomes, which State has the most concern about the existence of the alleged joint venture.

Clearly, it is of little moment to the States of Mite's incorporation and principal business location whether the purchaser of Mite's property is a corporation (O. S. G.) or a joint venture (O. S. G. and plaintiff). Nor is it significant that Illinois was the place where the contract was allegedly made. That an agreement between highly mobile businessmen about a venture to purchase New York property would have been reached in Illinois can only be termed "accidental," and by itself creates no interest in the matter for Illinois.

The parties to the alleged venture are New York and Illinois residents, and both States therefore have some interest in the venture's status. But the crucial factor is that the object of the alleged venture was the purchase and operation of a New York corporation. New York has a far more immediate concern than Illinois in determining which parties actually possess an interest in New York property, and of what their interests consist. Thus, considering that one party to the alleged venture is a New York resident, and that the purpose of the venture was to acquire and operate a New York corporation, the Court finds that New York's interest in the joint venture question is paramount, and applies New York law. We turn to an analysis of the cases setting forth the principles which govern joint venture agreements under New York law.

### 2. *Prerequisites of a Joint Venture*

Plaintiff claims that he and O. S. G. agreed to a joint venture. He was to provide 5% of the capital needed to purchase Sossner, and was to make initial contacts to set up negotiations for the purchase. O. S. G. was to provide the bulk of the purchase money.

These allegations are strikingly similar to those made by the plaintiff in *Yonofsky v. Wernick*, 362 F.Supp. 1005 (S.D.N.Y.1973). In *Yonofsky*, the plaintiff contended that he and the defendant entered an oral agreement to acquire and operate as a joint venture a corporate division. Plaintiff was to use his close relationship with the parent corporation's officers to "initiate, influence, arrange and facilitate" the sale of the division, and defendant was to supply the purchase money. Plaintiff claimed the defendant arranged the sale and ousted him from the venture. (Defendant interposed the Statute of Frauds as a defense, but the court found joint venture contracts to be outside the Statute.) The court was faced with the task of determining whether a venture had indeed been created.

Summing up the New York cases on point, the Court established prerequisites for a joint venture contract:

1. There must be a specific agreement to carry on some enterprise for profit;[1]

2. The agreement must manifest the intent of the parties to be associated as joint venturers;[2]

3. Each co-adventurer must make a contribution of property, financial resources, effort, skill, or knowledge;[3]

4. The parties must have some degree of joint proprietorship and control over the enterprise;[4]

5. There must be a provision for the sharing of profits and, most courts agree, losses.[5] The profits accruing must be joint and not several.[6]

After a review of the cited authorities, this Court is of the opinion that this summary fairly states the law on point.

*Yonofsky* concluded with an analysis of the conversation at which the joint venture allegedly was made. Defendant admitted plaintiff discussed with him the acquisition of the corporate division. He contended that plaintiff voluntarily offered to speak to the parent corporation as to the availability and price of the division. He admitted that plaintiff, during the conversation, expressed a desire to "get into the act." 362 F.Supp. at 1033. Despite all of this, the Court found that no specific joint venture agreement was reached:

"Viewed in the light most favorable to plaintiff, the testimony reveals that Yonofsky was promised something by defendant if he aided defendant's acquisition of the DeJur Potentiometer Division. But that something was never clearly revealed; it certainly was not a fifty-percent interest in defendant's business. Perhaps it was a promise of employment, but even this was never definitely worked out between the parties. Whatever arrangement may have existed between the parties was at best vague and indefinite. The court concludes that plaintiff has failed to carry his burden to establish, by a preponderance of the credible evidence, that defendant agreed to enter into the asserted joint venture." *Id.* at 1036.

In *Yonofsky* the judge was reviewing evidence introduced at trial. Here we deal with a motion for summary judgment, and we cannot rule that plaintiff's joint venture theory fails for lack of an express agreement, as a matter of law, unless no genuine factual issue exists. The party opposing a summary judgment motion is to be given the benefit of all reasonable doubts in determining whether a genuine issue remains. *Adickes v. S. H. Kress and Company*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.

1. 362 F.Supp. at 1031, citing *Rizika v. Kowalsky*, 207 Misc. 254, 138 N.Y.S.2d 717 (Sup.Ct. Oneida County 1954), aff'd, 285 App.Div. 1009, 139 N.Y.S.2d 299 (4th Dept.), reargument and appeal denied, 285 App. Div. 1116, 141 N.Y.S.2d 515 (4th Dept. 1955).

2. Ibid., citing *Shore v. Siegbert*, 239 App.Div. 334, 267 N.Y.S. 306 (1st Dept. 1933); *Hutchinson v. Birdsong*, 211 App.Div. 316, 207 N.Y.S. 273 (1st Dept. 1925); *Levine v. Personnel Institute, Inc.*, 138 N.Y.S.2d 243 (Sup.Ct.N.Y.County 1954), aff'd, 2 A.D.2d 964, 158 N.Y.S.2d 740 (1st Dept. 1956).

3. Ibid., citing *Wagner v. Derecktor*, 306 N.Y. 386, 390, 118 N.E.2d 570 (1954); *Mitler v. Friedeberg*, 32 Misc.2d 78, 222 N.Y.S.2d 480 (Sup.Ct. N.Y.County 1961).

4. Ibid, citing *Wagner, supra*; *Levine, supra*; *LaDreire v. Martin*, 56 N.Y.S.2d 436 (Sup. Ct.N.Y.County 1945); Taubman, What Constitutes a Joint Venture, 41 Cornell L.Q. 640, 644 (1956); Nichols, Joint Ventures, 36 Va.L.Rev. 425, 439 (1950). See 32 N.Y. Juris. Joint Adventures §§ 1, 10.

5. Ibid. at 1032, citing *Steinbeck v. Gerosa*, 4 N.Y.2d 302, 175 N.Y.S.2d 1, 151 N.E.2d 170 (1958); *Wagner, supra*; *George W. Haxton & Son., Inc. v. Rich*, 267 App.Div. 492, 47 N.Y.S.2d 501 (3d Dept. 1944); *Columbian Laundry v. Hencken*, 203 App.Div. 140, 196 N.Y.S. 523 (1st Dept. 1922) and four State Supreme Court cases.

6. *See United States v. Standard Oil*, 155 F. Supp. 121, 148 (S.D.N.Y.1957), aff'd, 270 F.2d 50 (2nd Cir. 1959).

Ed.2d 142 (1970); *First National Bank of Cincinnati v. Pepper*, 454 F.2d 626 (2d Cir. 1972); see Wright & Miller, Federal Practice and Procedure: Civil §§ 2725, 2727. Facts asserted by the party opposing the motion, if supported by affidavits or other evidentiary material, are regarded as true. *First National Bank of Cincinnati v. Pepper, supra.*

■ In the instant case, plaintiff offers some evidence to support his claim that a joint venture agreement was reached with Mr. Zoppelt. At p. 41 of plaintiff's deposition he describes his meeting with Zoppelt on May 14, 1973, as follows:

"Q. Mr. Flammia, you indicated that when you talked to Mr. Zoppelt in Chicago during May, that you had some kind of an agreement as to your employment with Sossner should Sossner be purchased by O.S.G.?

A Yes.

Q Could you tell us, or would you outline for us, what the agreements were that you entered into at that time?

A He agreed to employ me as president and allow me to be a part owner of the corporation.

And he was very happy that I was willing to be a part owner of the corporation, because that is the only way he would like to operate.

Q Was there any discussion as to the amount of salary or income that you were to receive in this position?

A He said that he—I would say at least as much as I did working for Sossner, if not more, plus a tremendous potential which went up into the six-figure bracket; he talked about $100,000 a year."

Plaintiff indicates in other portions of his deposition as well that he believes a binding agreement was entered, see, e. g., pp. 25, 26–27.

It should also be noted that Mr. Zoppelt, at several points during his deposition, refers to a "joint venture" which his corporation formed with the plaintiff.

This evidence does not make the existence of a joint venture contract a certainty. Indeed, strong evidence to the contrary is also contained in the record. And it is not clear at this time whether Mr. Zoppelt had actual or apparent authority to bind his corporation, O. S. G., in a joint venture contract.

But the Court is of the opinion that the evidence supporting plaintiff's position is adequate to preclude a grant of summary judgment against him. Accordingly, the Court holds that the question of the existence of a joint venture contract between plaintiff and O. S. G. must be determined at trial.

**B.** *Statute of Frauds*

Plaintiff introduced his joint venture theory as an answer to defendant's claim that the Statute of Frauds barred an oral finder's contract. In response to a motion for summary judgment, this Court will also determine if there is an alternative legal theory which requires that the motion be denied. We proceed to consider whether the signed memoranda, introduced by the parties and relating to their dealings, take the case out of the Statute.

1. *The Choice of Law Question*

Again we begin by determining which State's law governs the matter to be considered. Defendants have interposed the Statute of Frauds as an affirmative defense and argue that New York law should be applied. Plaintiff alleges in his complaint that the law of Illinois is controlling. The Court finds that under the circumstances of this case, it is appropriate to apply the law of New York.

Under the "interest analysis" conflicts approach (see *Auten v. Auten, supra*) we apply the law of the State with the greatest interest in the resolution of the legal issue. *Intercontinental Planning, Ltd. v. Daystrom*, 24 N.Y.2d 372, 300 N.Y.S.2d 817, 248 N.E.2d 576 (1969),

clearly stated the concern of New York as a center of finance with regulating the activities of its resident finders and brokers.

In *Daystrom* the Court of Appeals was required to choose between the contract law of New York and that of New Jersey in determining the validity of an oral contract between a New Jersey principal and a New York finder. The court reviewed the legislative history of General Obligations Law § 5–701(10) and concluded that the requirement of a writing under subdivision 10 was based "at least in part upon the premise that the 'danger of erroneous verdicts' in allowing juries to determine claims for brokerage and finder's fees on oral testimony warranted [it]." 24 N.Y.2d at 383, 300 N.Y.S.2d at 826, 248 N.E.2d at 582 citing *Minichiello v. Royal Business Funds Corp.*, 18 N.Y.2d 521, 526–27, 277 N.Y.S.2d 268, 223 N.E.2d 793 (1966), *cert. denied,* 389 U.S. 820, 88 S.Ct. 41, 19 L.Ed.2d 72 (1967).

In addition, § 5–701 was intended to "protect the principals in the sale of a business interest from the type of claim being asserted here—a . . . finder's fee not supported by the written evidence." 24 N.Y.2d at 383, 300 N.Y.S.2d at 826, 248 N.E.2d at 582. This policy protects not only the interests of New York residents, but also those of foreign principals who utilize New York brokers or finders:

"It is common knowledge that New York is a national and international center for the purchase and sale of businesses and interests therein. We conclude therefore that the Legislature in enacting subdivision 10 of former section 31 intended to protect not only its own residents, but also those who come into New York and take advantage of our position as an international clearing house and market place. This is true because of all the jurisdictions involved, New York law affords the foreign principals the greatest degree of protection against the unfounded claims of brokers and

finders. This encourages the use of New York brokers and finders by foreign principals and contributes to the economic development of our State. Our brokers and finders need only ensure that their agreements for compensation comply with the Statute of Frauds to receive the benefits of New York's position as a business center. *Id.* at 383, 384, 300 N.Y.S.2d at 826, 248 N.E.2d at 582.

This concern of New York for regulating its finders and brokers, and thereby maintaining New York's status as a financial center, was sufficient to justify application of New York law under the "interest analysis" conflicts approach.

A factual situation similar to that of the instant case was the basis of litigation in *Pallavicini v. International Telephone and Telegraph Corporation,* 41 A.D.2d 66, 341 N.Y.S.2d 281 (1973), aff'd, 34 N.Y.2d 913, 359 N.Y.S.2d 290, 316 N.E.2d 722 (1974). Pallavicini was a foreign unlicensed broker who sought a commission for services rendered in connection with the purchase by defendant, Sheraton Hotels, of a hotel in Mexico. According to the plaintiff, the services included a conversation during a transcontinental flight, and telephone conversations and correspondence from New York (plaintiff's temporary residence) with persons in other states and countries.

Again because of New York's substantial interest in protecting its reputation as a financial center, the court applied New York law.

 Admittedly the two cases cited are cases in which the New York Statute of Frauds absolved the foreign principals of contract liability. It will be seen that in the present case, New York law will not bar plaintiff's *quantum meruit* claim. We must determine whether this distinguishing characteristic requires that we turn to Illinois for governing law. Stating the task another way, we assume that Illinois law would lead to a contrary result (about which

the parties differ). We assume that New York law aids New York's finder, and that Illinois law supports Illinois' principal. The Court finds that even under these circumstances, New York law must be applied.

The purpose of § 5–701(10) as recited in *Daystrom* and *Pallavicini* is to promote New York businesses by protecting foreign clients. It does not follow, however, that New York has no interest in applying its own law when foreign law is even more favorable to foreigners. New York has an important interest in seeing that the choices of law for disputes arising from New York business dealings are made consistently. Only certainty about their rights and duties can persuade principals and brokers that New York is an appropriate place in which to conduct business. No broker could be certain of what legal steps would be required of him if his responsibilities changed with the state or national citizenship of his principals.

And beyond the benefits of certainty are the benefits New York obtains in protecting its brokers and finders from unreasonably unfavorable foreign law. New York does not have an interest in applying the law least favorable toward its residents. Rather, New York is interested in encouraging business by affording reasonable protection both to principals and brokers. The alternative, application of the law least favorable to brokers, might destroy New York commerce by driving brokers from New York.

With these considerations in mind, we apply the law of New York in analyzing the contractual relations of the parties.

2. *The Sufficiency of the Memorandum under the New York Statute of Frauds*

Subdivision 10 of the Statute of Frauds (N.Y.Gen.Oblig. Law, § 5–701), set out in full at page 1125, above, requires that a contract to pay a broker-age commission or a finder's fee be in writing.

Defendants contend that this Section is an absolute bar to the plaintiff's claim and cite *Minichiello v. Royal Business Funds Corp., supra,* in support of their position. In *Minichiello* a business broker, *with no written memorandum of his alleged contract with the defendants,* brought an action in *quantum meruit.* After reviewing the legislative history surrounding the enactment of Section 5–701 (subd. 10) of the General Obligations Law and its predecessor, Section 31 (subd. 10) of the Personal Property Law, and the recommendations made by the Law Revision Commission with respect to each enactment, the court concluded that both statutes preclude any recovery in *quantum meruit. Id.* p. 271 of 277 N.Y.2d, p. 795 of 223 N.E.2d. However, *Morris Cohon & Co. v. Russell,* 23 N.Y.2d 569, 297 N.Y.S.2d 947, 245 N.E.2d 712 (1969), narrows the holding of *Minichiello* to situations where there is a "complete absence of any memorandum." *Id.* p. 572, 297 N.Y.S.2d 947, 245 N.E.2d 712. *Morris Cohon* is more applicable to the facts of the case at bar than is *Minichiello.* See also *Peters v. Sigma Data Computing Corp.,* 397 F. Supp. 1098 (E.D.N.Y.1975).

In *Morris Cohon,* plaintiff sought to recover a sum for the "fair and reasonable value" of services [quantum meruit] which it claimed to have rendered as a broker or finder in connection with the sale by the defendant of certain shares of stock. Plaintiff relied upon a clause in the contract of sale between the parties which reads as follows:

"The sellers represent and warrant that they have dealt with no person or persons other than Morris Cohon & Co. as broker or finder in connection with the transactions in this agreement, and that all negotiations relative to this agreement have been carried on by them without the intervention of any other broker or finder, and the Sellers agree to indemnify

Buyer and the Company and hold them harmless against and in respect of any claim for brokerage or finder's commission relative to this agreement whether by said Morris Cohon & Co. or otherwise". 23 N.Y.2d at 573, 297 N.Y.S.2d at 950, 245 N.E.2d at 714.

In holding that such a memorandum was sufficient to support a claim for compensation in *quantum meruit* by Morris Cohon & Co. against the sellers, the Court of Appeals made the following pertinent comments in regard to the Statute of Frauds and *quantum meruit* (23 N.Y.2d at pp. 574–76, 297 N.Y.S.2d at p. 951, 245 N.E.2d at p. 714):

> "The Statute of Frauds was designed to guard against the peril of perjury; to prevent the enforcement of unfounded fraudulent claims. But, as Professor Williston observed: 'The Statute of Frauds was not enacted to afford persons a means of evading just obligations; nor was it intended to supply a cloak of immunity to hedging litigants lacking integrity; nor was it adopted to enable defendants to interpose the Statute as a bar to a contract fairly, and admittedly, made' (4 Williston Contracts [3d ed.], § 567A, pp. 19–20)." 23 N.Y.2d at 574, 297 N.Y.S.2d at 952, 245 N.E.2d at 715.

The court proceeded to explain that a memorandum insufficient to take a contract out of the Statute of Frauds because it failed to state a rate of compensation might nevertheless serve in an action in *quantum meruit*:

> "We specifically note that in reaching this conclusion we do no violence to the well-established rule that in a contract action a memorandum sufficient to meet the requirements of the Statute of Frauds must contain expressly or by reasonable implication all the material terms of the agreement, including the rate of compensation if there has been agreement on that matter (*Poel v. Brunswick-Balke-*

*Collender Co.,* 216 N.Y. 310, 314, 110 N.E. 619, 620; *Donald Friedman & Co. v. Newman,* 255 N.Y. 340, 174 N.E. 703, 73 A.L.R. 95; Restatement, 2d, Contracts, § 207 [Tent. Draft No. 4, 1968]). In an action in *quantum meruit,* however, for the reasonable value of brokerage services, if it does not appear that there has been an agreement on the rate of compensation, a sufficient memorandum need only evidence the fact of plaintiff's employment by defendant to render the alleged services. The obligation of the defendant to pay reasonable compensation for the services is then implied. Indeed, as noted earlier, the statute itself provides that 'This provision shall apply to a contract implied in fact or in law to pay reasonable compensation' (General Obligations Law, § 5–701)." 23 N.Y.2d at pp. 575–76, 297 N.Y.S.2d at p. 953, 245 N.E.2d at 715.

■ It appears from the material in the record that plaintiff is entitled to *quantum meruit* relief for his time, effort and expense. We need not be concerned at this time with the question whether both or only one of the defendants requested that plaintiff supply services (although in this case it appears that O. S. G. did). If either or both did, plaintiff would appear to be entitled to recovery on a theory of work, labor and services, if nothing else. Any other result would allow defendants unjust enrichment, at plaintiff's expense, as a consequence of plaintiff's exertions on their behalf and at the behest of at least one of them.

■ The memoranda indicating that plaintiff is entitled to relief, and the memoranda which take the agreement out of the Statute of Frauds (as in *Morris Cohon*), are one and the same. First are letters from plaintiff to each defendant dated May 17, 1973. The letters express the plaintiff's role in beginning the Sossner negotiations and urge de-

**1132**

fendants to consider seriously the possibilities of an acquisition:

"OSG Tap and Die, Inc.
398 West Wrightwood
Elmhurst, Illinois 60126
Attention: Mr. T. Osawa

Dear Mr. Osawa:

It was a real pleasure to meet and discuss with you and Mr. Zoppelt the possibilities of acquiring Sossner Tool Divion [sic] by OSG.

As you know, I spoke to Mr. Leo Brancato, Executive Vice President of Mite Corporation on Monday, May 14, and told him that I had lined up a possible buyer for the Sossner Division but didn't reveal your company identity.

On Wednesday, May 16th, I spoke to Mr. Brancato again and told him that your company (OSG) was the interested party, after my phone conversation with Mr. Zoppelt on Tuesday afternoon, wherein he authorized me to act in your company's behalf.

Mr. Brancato asked for a little time to mull over the offer to buy Sossner—at least this week-end and said that he would get in touch with me.

He did ask for your name and Mr. Zoppelt and I gave the names to him together with your address and telephone number. I imagine that he is going to draw a D & B on your company before he continues any possible negotiations.

I will keep in touch with Mr. Brancato and if I do not hear from him by Wednesday, May 23rd, I will phone him on Thursday, the 24th.

The more I think about the possibilities of the merger of OSG and Sossner, the more enthusiastic I get.

Very truly yours,

G. T. Flammia
3999 Alken Avenue
Seaford, New York 11783"

"Mite Corporation
Shelter Rock Lane
Danbury, Conn. 06810
Attention: Mr. Leo J. Brancato, Exec. V.P.

Dear Leo:

I sincerely believe that you should very seriously consider the possibilities of selling the Sossner Division to OSG Tap and Die as per our phone conversations last Monday and Wednesday.

As you will recall from my forecast for fiscal 1974, the need for further capital investment in Sossner is heavy and the return on investment will be low this year and the next few years.

During the last couple of months I have visited other cutting tool companies on job interviews and courtesy calls. Very few of those companies are making any money and those few are making the little that they do on large volume and related product mix.

I have notified OSG that you are mulling over the possibilities of entering into negotiations and that you will be getting in touch with me soon.

Very truly yours,
s/

G. T. Flammia
3999 Alken Avenue
Seaford, New York 11783
516–785–2409 or 516–722–3895"

Express reference to the Osawa letter is made in a signed response from Zoppelt dated May 24, 1973. This critical letter acknowledges plaintiff's initial service and, at its end, invites further action in defendants' behalf.

"Mr. G. T. Flammia
3999 Alken Avenue
Seaford, NY 11783

Dear Gerry:

Thank you for your letter of May 17, I look forward to hearing the results of your further discussions with Mr. Brancato.

\* \* \* \* \* \*

We agree with you and believe that the OSG acquisition of Sossner could be very meaningful. Through our Japan production capabilities, ability to furnish automatic thread and flute grinders, etc., we can turn around and solve the problems you have outlined in your proposal in quick order and make this division a major factor in the US tap market. We believe that we are the only ones capable of doing it because no one has the additional production capability to immediately meet the Sossner need.

Mr. Osawa, Terry's father, will be coming to the United States approximately two weeks from now. When he is here, it would be a good time for us to visit the Sossner facilities and meet with yourself and Mr. Brancato. Prior to his visit, it would be well that we had the balance sheet and operating statement for our study and analysis. Thank you for making the contact at Sossner and we look forward to hearing the results of your discussion with him on May 23 or 24.

Sincerely yours,

OSG TAP AND DIE , INC.

s/ Robert R. Zoppelt
Robert R. Zoppelt
Vice-President"

The next communication in writing, dated June 2, 1973, was a short letter from plaintiff to defendant O. S. G. stating that "rather than confusing the possible deal, I am putting off any final decision to start making taps or any type set up for the present."

On June 4, 1973 plaintiff first mentioned a finder's fee to defendant Mite. Mite flatly rejected the idea that it was responsible for a finder's fee but did not deny plaintiff's participation in the previous events.

On June 13, 1973, plaintiff (in response to a request from Mr. Zoppelt) sent Zoppelt a memo setting forth his proposals for salary and benefits should he be employed by O. S. G. Mr. Zoppelt rejected his terms, and made a written counteroffer to plaintiff dated July 2, 1973. After discussions with Mr. Demory, who was to be plaintiff's superior, plaintiff refused the counteroffer. Mr. Zoppelt confirmed the rejection in writing on July 17, 1973.

These communications, like those in *Morris Cohon*, sufficiently identify the seller; identify and establish plaintiff's role in the negotiations; establish the subject matter of the transaction; and, most important, acknowledge performance by and obligation to the plaintiff as a consequence of his assistance in arranging the sale of Sossner. *Morris Cohon & Co., supra; Peters v. Sigma Data Computing Corp., supra.* They are sufficient to support a claim for compensation under a theory of *quantum meruit.* And they dispel all fears of the type that courts have expressed in the past when applying § 5–701. See *Minichiello v. Royal Business Funds Corp., supra; Intercontinental Planning, Ltd. v. Daystrom, supra and Pallavicini v. International Telephone and Telegraph, supra.*

■ Nor is it significant that the "memorandum" of the agreement consists of a number of separate writings, not all of which are signed by officers of defendants with authority to bind their corporations. Writing sufficient to satisfy the Statute need not be contained in one document. Separate documents dealing with the same subject matter suffice if the connection of documents not signed by a party with those that are signed is demonstrated by internal reference or by subject matter. *Transit Advertisers v. New York, New Haven & H.R. Co.*, 194 F.2d 907 (2d Cir.), *cert. den.*, 344 U.S. 817, 73 S.Ct. 11, 97 L.Ed. 636 (1952); *Crabtree v. Elizabeth Arden Sales Corp.*, 305 N.Y. 48, 110 N.E.2d 551 (1953); *Marks v. Cowdin*, 226 N.Y. 138, 123 N.E. 139 (1919). Such is the case here.

Plaintiff's cause of action is not, therefore, barred by the Statute of Frauds. For this reason, as well as be-

cause of the possible existence of a joint venture, the defense motion is denied.

## II

*Plaintiff's Motion for Summary Judgment*

Plaintiff requests that the third and fourth defenses of defendants' answers be stricken. Those defenses are based on the Statutes of Frauds of New York and Illinois. It follows from the prior discussion that those defenses are ineffective as a matter of law. Plaintiff's request is granted.

 Plaintiff also asks that the fifth defense of defendant O. S. G. be stricken. That defense is based on § 442–d of New York Real Property Law, and will detain us only briefly.

Section 442–d reads:

"No person, copartnership or corporation shall bring or maintain an action in any court of this state for the recovery of compensation for services rendered, in any place in which this article is applicable, in the buying, selling, exchanging, leasing, renting or negotiating a loan upon any real estate without alleging and proving that such person was a duly licensed real estate broker or real estate salesman on the date when the alleged cause of action arose."

The sale of Sossner by Mite was not a sale of real estate within the meaning of the Statute. It is well settled that "If an item of real estate, or an interest in real estate, is a mere incident or incidental feature of the transaction obviously the statute should not apply." *Dodge v. Richmond,* 5 A.D.2d 593, 595, 173 N.Y.S.2d 786, 788 (1958) (sale of steel corporation). "A broker need not be licensed under the provisions of the Real Property Law (Art. 12–A) to bring about a sale of a business." *Shaloy v. Rosovsky,* 136 Misc. 132, 133, 239 N.Y.S. 54 (Sup.Ct.App.Term 1929) (drug store business). See also, e.g., *Weingast v. Rialto Pastry Shop, Inc.,* 243 N.Y. 113, 152 N.E. 693 (1926); *Myer v. Jova*

*Brick Works, Inc.,* 38 A.D.2d 615, 326 N.Y.S.2d 321 (1971). In the absence of evidence that the chief object of the purchase of Sossner was real estate, plaintiff's motion must be granted.

## Conclusion

Defendants' motion for summary judgment is denied. Plaintiff's motion for partial summary judgment, as to defenses based on the Statute of Frauds and Real Property Law, is granted. Plaintiff is granted leave to amend his complaint within 21 days so that it sets forth a proper claim on the alleged joint venture contract. A trial must be held to determine, *inter alia*, whether a joint venture contract existed and the value of services performed by plaintiff for the defendants.