**N. DORMAN & COMPANY, INC., Plaintiff,**

v.

**NOON HOUR FOOD PRODUCTS, INC., Defendant.**

No. 79 Civ. 933.

United States District Court, E. D. New York.

Nov. 21, 1980.

Peirez, Ackerman & Levine, Great Neck, N. Y. by Robert N. Zausmer, Great Neck, N. Y., for plaintiff.

Kronen & Bernstein, New York City by Carl D. Bernstein, and David Finnegan, New York City, of counsel, for defendant.

## MEMORANDUM AND ORDER

PLATT, District Judge.

This is an action by a cheese importer and distributor seeking damages against another cheese dealer for the latter's breach of an alleged agreement relating to the use of two Canadian import licenses. Jurisdiction is asserted under 28 U.S.C. § 1332(a)(1), diversity of citizenship. A non–jury trial was held on June 12 and July 24, 1980 and this Court reserved decision pending submission of post–trial briefs on the question of whether the writings which passed between the parties manifest an agreement and thus suffice to satisfy the statute of frauds.

I

The facts of this case, particularly as to the issue whether there was any agreement, written or otherwise, are much in dispute. But, taking into account the credibility of all the witnesses, we find the following to have transpired.

On November 21, 1978, Mr. Neil Dorman, vice president of N. Dorman & Company, Inc. ("Dorman, Inc."), telephoned Mr. Joseph Oswald, an employee of Noon Hour Food Products, Inc. ("Noon Hour"), to inquire about the availability of any Canadian

cheese import licenses[1] that Noon Hour might have. (Trial transcript of June 12, 1980 at 11–12, hereinafter June 12 Tr.) The purpose of the call was to attempt to enter into an agreement whereby Noon Hour, the license holder, would use the licenses for the benefit of Dorman, Inc., a non–licensed company. (June 12 Tr. at 29).[2]

After a brief inquiry, Mr. Oswald informed Mr. Neil Dorman that the licenses held by Noon Hour had not been used and were available. At that time, Mr. Oswald[3] orally agreed[4] that Noon Hour would use the licenses as directed by Dorman, Inc. in return for a guaranteed profit to Noon Hour of 10 cents per pound of cheese imported. (June 12 Tr. at 28–30, 78–80, 90–94). However, because there was some uncertainty on his part as to the applicability of the licenses to the importation of the cheese desired by Dorman, Inc., Mr. Neil Dorman told Mr. Oswald that confirmation of the agreement must await arrival of some information from the United States Department of Agriculture but that he would get back to Mr. Oswald within the next few days.[5] (June 12 Tr. at 32). Soon after this conversation, Mr. Oswald forwarded copies of the licenses to plaintiff with a covering letter dated November 21, 1978. (See *infra* p. 296).

In the course of the next few days, Mr. Oswald informed Mr. Neil Dorman that another offer, guaranteeing a profit of 15 cents per pound, for the use of the licenses had been received. Mr. Neil Dorman responded by matching that offer to keep the deal alive. (July 24 Tr. at 19; June 12 Tr. at 45–47).

Following this series of conversations, Dorman, Inc. on November 27th sent to Mr. Oswald a letter and a power of attorney form to be filled out by Mr. Oswald so that the customs brokers could handle the paperwork on these transactions. (June 12 Tr. at 54; July 24 Tr. at 100). This form was never completed by Mr. Oswald or any one at Noon Hour. (July 24 Tr. at 103).

As Mr. Neil Dorman discovered on the 27th of November, all these transactions went for nought. Early that day, he placed a call to Noon Hour and spoke with Mr. Eugene Lundblad, the employee of Noon Hour who actually had the power to deal with the import licenses but who had been away during the week of the 21st. Mr. Lundblad informed him that the Canadian import licenses could not be used to benefit Dorman, Inc. because, unbeknownst to Mr. Oswald, these licenses had been previously committed to another party. (June 12 Tr. at 57; July 24 Tr. at 88). Mr. Neil Dorman immediately protested that Mr. Oswald had obligated Noon Hour to Dorman, Inc. and that Dorman, Inc. had already committed itself to resell this cheese to another party. (June 12 Tr. at 57).[6]

1. The United States Department of Agriculture issues import licenses, entitling the holder to purchase and import cheese into the U.S. (June 12 Tr. at 28).

2. There had been an earlier call from Mr. Neil Dorman to Mr. Joseph Oswald concerning another unrelated sale of cheese. (June 12 Tr. at 9).

3. Mr. Joseph Oswald, however, was without authority to enter into these types of agreements though at no time did he ever inform Mr. Neil Dorman of that fact.

4. Throughout the proceedings Mr. Oswald asserted that he did not agree with Mr. Dorman to so use the licenses. While there is no written evidence which suggests that there was an agreement, we credit the testimony of Mr. Neil Dorman and believe that there was some sort of understanding between the parties. Never-

theless, as we indicate *infra*, plaintiff must get by the bar imposed by the statute of frauds.

5. The U.S.D.A. was about to permit Canadian cheese import licenses to be used to import New Zealand cheese since there was little or no Canadian cheese available. (June 12 Tr. at 32). The fact that "confirmation" from Dorman, Inc. was still forthcoming does not preclude a finding by this Court that Noon Hour had orally agreed to use the licenses to the benefit of Dorman, Inc.

6. In a totally unrelated transaction, Mr. Ken Dorman, another vice president of Dorman, Inc., had arranged with Mr. Bernard Golbach of Borden, Inc. to sell to Borden, Inc. 300,000 lbs. of cheese. (June 12 Tr. at 112–113; *Deposition of Bernard Golbach* at 3–8, 14–16, 41–42). During the course of this transaction, Mr. Golbach intimated that Borden would be interested in purchasing more cheese from Dorman, Inc.

The next day, November 28th, Mr. Lundblad sent a telex to Mr. Neil Dorman, restating Noon Hour's position that the licenses were not available. (July 24 Tr. at 171–73). Mr. Neil Dorman responded with his own telex asserting that an agreement had been reached and that the licenses should be used to benefit Dorman, Inc. (July 24 Tr. at 178). Finally, a letter was sent by Dorman, Inc.'s counsel to Mr. Oswald threatening legal action if Noon Hour did not abide by its agreement. (June 12 Tr. at 63). Needless to say, Noon Hour did not so use its licenses and this action resulted.

## II

The controlling legal issue presented by this case is whether the writings suffice to take the agreement out of the statute of frauds. Both parties agree that this question is governed by U.C.C. § 2–201.[7]

(1) Except as otherwise provided in this section a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought . . . .

(2) Between merchants if within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know its contents, it satisfies the requirements of subsection (1) against such party unless written notice of objection to its contents is given within ten days after it is received.

New York U.C.C. § 2–201(1) and (2) (McKinney 1964).

if it could be had. (June 12 Tr. at 112). Consequently, when Mr. Neil Dorman informed Mr. Ken Dorman that he had obtained 350,000 lbs. of cheese from Noon Hour, the latter telephoned Golbach who agreed to purchase that amount from Dorman, Inc. (June 12 Tr. at 114–115).

7. - Whether New York's or Illinois's law applies matters little in interpreting this section since

■ The purpose of this section, and of the statute of frauds in general, is to guard against the perils of perjury and to prevent the enforcement of unfounded claims. *See Flammia v. Mite Corporation,* 401 F.Supp. 1121 (E.D.N.Y. 1975), *aff'd,* 553 F.2d 93 (1977); *Morris Cohon & Company v. Russell,* 23 N.Y.2d 569, 297 N.Y.S.2d 947, 245 N.E.2d 712 (1969). However, as § 2–201 indicates, the entire agreement need not be committed to writing nor need the writing state with precision all of the material terms. What is required is that "the writing afford a basis for believing that the offered oral evidence rests on a real transaction." *Iandoli v. Asiatic Petroleum Corp.,* 57 A.D.2d 815, 395 N.Y.S.2d 15 (1st Dept. 1977).

Putting aside for a moment the niceties of the legal arguments made by both sides and the case law gloss on U.C.C. § 2–201, we turn first to the writings in this case.

The first written communication, dated November 21, 1978, between the parties was sent by Joseph Oswald to Neil Dorman:

As per our phone conversation, we are herewith enclosing copies of documents in question.

Thank you very much for your consideration.

Attached thereto were copies of the Canadian cheese import licenses.

The second written communication, dated November 27, 1978, was sent by an employee of plaintiff to Mr. Oswald:

Enclosed please find power of attorney form. Please complete as soon as possible and return to:

W.D. Barth Customs Brokers
721 Chestnut Street
Philadelphia, Pa. 19106
Attention: Sabina

both are essentially the same. We therefore need not bother with deciding the conflicts question of which law applies. However, were the issue to be decided we would undoubtedly hold that New York law would apply under the "interest analysis approach" we used in *Flammia v. Mite Corporation,* 401 F.Supp. 1121 (E.D.N.Y. 1975), *aff'd* 553 F.2d 93 (2d Cir. 1977).

We are requesting this so that they can make entry with U.S. Customs in connection with the license transactions.

If you need any assistance please call me.

The third writing, contemporaneous with the second, to pass between the parties was a telex from Mr. Lundblad to Mr. Neil Dorman dated November 27, 1978:

Re our letter November 21 78 and our phone conversation of today please be advised we have been previously committed since the beginning of 1978. Mr. Oswald was not aware of this fact and we regret any inconvenience.

The final, material writing, dated November 28, 1978, to pass between Dorman, Inc. and Noon Hour was another telex from Neil Dorman to Mr. Oswald:

I tried calling you a few times after receiving Mr. Lundblad's telex.

I would appreciate a telephone call from you collect  516–364–1600

On the basis of your commitment to me, we committed ourselves for the purchase and sale of 350,000 pounds of cheese. We are now being pressured and threatened with legal action, and would be greatly appreciative if you would abide by our agreement.

Plaintiff argues that these writings evidence an agreement and point particularly to the telex of November 27, 1978 from Noon Hour to Dorman, Inc., stating that it "constituted a specific recognition of the existence of the Purchase Contract which Lundblad sought not to have the defendant perform." (Plaintiff's Post–Trial Memorandum of Law at 41). Defendant, for its part, argues that these writings evidence nothing more than "talk about a possible deal." (Defendant's Memorandum of Law at 9).

III

■ The official Comment to § 2–201 indicates that a memorandum will satisfy subsection (1) if it is signed, specifies a quantity, and evidences a contract for the sale of goods. The writings upon which plaintiff relies meet the first requirement: both Mr. Oswald and Mr. Lundblad effectively "signed" the letter and telex respectively. Arguably, the second requirement as to quantity is also met in that the copies of the licenses indicated that 350,000 pounds of cheese could be imported thereunder. It is well settled that we may consider "unsigned" documents in connection with "signed" documents as long as the connection between the "unsigned" and the "signed" documents is demonstrated by internal reference or subject matter. *See Flammia v. Mite Corporation, supra; Crabtree v. Elizabeth Arden Sales Corp.*, 305 N.Y. 48, 110 N.E.2d 551 (1953). Since there are no marks on the licenses and no specific limitation mentioned in the accompanying letter which would reveal that the licenses were used completely or in part, it is possible to infer from these writings that the quantity of cheese to be sold was the total listed on the import licenses.

Thus, the sole issue remaining for resolution is whether the writings, considered as a whole, evidence "by reasonable construction and necessary implication a contract for the sale of goods." *See Morris Cohon & Co. v. Russell, supra.*

We have carefully scrutinized all of the papers, paying close attention to the language used by the parties, and very reluctantly[8] find that the writings do not evidence a contract for the sale of goods. There simply is no language in any of the documents signed by the defendants which would give rise to an implication that a contract was made.

8. Our reluctance is based on a firm belief that Messrs. Dorman and Oswald reached a verbal agreement on Friday, November 24th, in which Mr. Dorman agreed that plaintiff would match an offer from another bidder and guarantee a fifteen cent per pound profit and withdrew his prior reservation of awaiting the arrival of information from the Department of Agriculture. Mr. Oswald denies that there was any such withdrawal, but this is not very convincing because if such were the case Mr. Oswald undoubtedly would have informed Mr. Dorman that he had to accept the other offer which was in hand and could not await information which might or might not be forthcoming from Washington. The hard fact is, however, that there is nothing in writing signed by the defendant indicating the perfection of any such agreement.

Plaintiff directs this Court's attention to a number of cases in which it was held that cancellations of orders previously made were sufficient to satisfy the statute of frauds. For example, in *Spiegel v. Lowenstein*, 162 A.D. 443, 147 N.Y.S. 655 (3d Dept. 1914), the New York court found that a telegram stating "cancel order for turnings and copper wire as same has been disposed of by my father" and that a subsequent letter acknowledging that the seller had set a price and sold the goods sufficed to take the agreement out of the statute of frauds. Similarly, in *John C. Wiarda & Co. v. Independent Chemical Co.*, n.o.r., 162 N.Y.S. 158 (1st Dept. 1916), the seller's letter stating "We are in receipt of your [orders which were specifically referred to by numbers] . . . . Under the circumstance, . . . we will have to cancel the order." was also held to take the agreement out of the statute. *See also Franklin Research & Development Corp. v. Swift Electrical Supply Co.*, 236 F.Supp. 992 (S.D.N.Y.), *aff'd* 340 F.2d 439 (2d Cir. 1964) (statute satisfied by letter seeking delay in delivery and letter seeking cancellation).

Plaintiff's reliance on these cases is misplaced for the writings in the above cited cases clearly indicate that a contract had been made and that one party was now seeking to cancel that contract. Furthermore, those writings set out with sufficient particularity the terms and details of the transactions and specifically referred to an existing agreement. The writings in evidence in the instant case do not come close to meeting those standards. Even Mr. Lundblad's telex, which indicates that the licenses were previously committed, cannot be read as a cancellation of an acknowledged agreement.

██ For documents to satisfy the requirements of the statute of frauds, they must "standing alone, . . . completely [represent] an acknowledgment or admission of the party of the existence of an agreement,

promise or undertaking which obligates him to pay or perform as alleged." *Oswald v. Allen*, 285 F.Supp. 488, 493 (S.D.N.Y. 1968), *aff'd* 417 F.2d 43 (2d Cir. 1969), *quoting Morris Cohon & Co. v. Russell, supra* 29 A.D.2d at 225, 287 N.Y.S.2d at 435 (1st Dept. 1968). The writings offered here lack such completeness. No mention is made in either the letter from Mr. Oswald or the telex from Mr. Lundblad of any contract or agreement. No words are present which would indicate that the defendant had committed itself in any way to the plaintiff. There is no language, such as "our letter agreement" or "this will confirm", from which we can infer the existence of a contract.[9] There is no purchase order and no invoice setting out the details of transaction.[10]

Defendant had sent two "writings" to plaintiff: essentially copies of an import license and a telex stating that defendant was previously committed. We can in no way piece these writings together as evidence that an agreement, in fact, existed. At best, these writings may be regarded as evidence of preliminary negotiations and the failure thereof. *See FMC Finance Corp. v. Reed*, 592 F.2d 238 (5th Cir. 1979); *In re Flying W Airways, Inc.*, 341 F.Supp. 26 (E.D.Pa.1972). Even if we include in these writings plaintiff's letter enclosing a power of attorney form, the result does not differ. There is no language of confirmation nor mention of an agreement. Reference to "license transactions" alone does not sufficiently identify the nature of the "transactions" to support an inference of completed negotiations. Simply stated, unlike the *Flammia* case in which this Court found that the writings satisfied the statute of frauds, there is no plethora of writings from which we can infer that an agreement was, in fact, reached. Therefore, plaintiff's action is barred by the statute of frauds and judgment must be entered for the defendant.

SO ORDERED.

---

9. *See e. g., Transammonia Export Corp. v. Conserv, Inc.*, 554 F.2d 719 (5th Cir. 1977); *Ace Supply, Inc. v. Rocky–Mountain Machinery Co.*, 96 Idaho 183, 525 P.2d 965 (1974).

10. *See e. g., Franklin Research & Development Corp. v. Swift Electrical Supply Co., supra; Thomaier v. Hoffman Chevrolet, Inc.*, 64 A.D.2d 492, 410 N.Y.S.2d 645 (2d Dept. 1978).