AMERICAN WEB PRESS,
INC., Plaintiff,

v.

HARRIS CORPORATION, Defendant.

Civ. A. No. 82–A–1684.

United States District Court,
D. Colorado.

Nov. 3, 1983.

Richard W. Breithaupt, Wegher & Fulton, P.C., Denver, Colo., for plaintiff.

David Swinton, W. David Pantle, Sherman & Howard, Denver, Colo., for defendant.

## MEMORANDUM OPINION AND ORDER

ARRAJ, Judge.

American Web Press, Inc. brought this diversity action against Harris Corporation for breach of a purported contract to sell a used M–1000 printing press to plaintiff. 28 U.S.C. § 1332(a)(1). American Web now seeks damages for the alleged breach.

The issues of liability and damages were bifurcated and a non-jury trial on the question of liability was held October 12 and 13, 1983. The following will constitute my findings of fact and conclusions of law as

required by Federal Rule of Civil Procedure 52(a).

## I

American Web is a Colorado corporation engaged in the business of commercial and publication printing. During the summer of 1982, it was considering expanding its operation and was in the market for a second used printing press.

Defendant Harris, a Delaware corporation, manufactures and sells printing equipment to the graphic arts industry. It is a large, national business with several major regional divisions. Two divisions, the Texas office—Commercial Press and the Rhode Island office—Publication Press, are important in the case at bar because they were involved in an inter-division competition to sell the press in issue.

In August 1982 a salesman from the Commercial Press Division of Harris, Claude Chinn, contacted American Web about a used M–1000 press it had for sale. After some discussion, American Web agreed to see the press (at Harris' expense) at Pisani Carlisle Graphics in San Francisco, California, where it was still located and operated. On September 10, 1982, representatives of American Web[1] and Harris[2] went to Pisani Carlisle Graphics and observed the press in operation. After this inspection, American Web's chief representative, Gary Hansen, indicated that his company was very interested in the machine. But Hansen was neither prepared nor willing to commit American Web to a binding agreement that day. He had not pre-arranged financing for its purchase, and he had failed to consult in advance with his attorney. Consequently, when Harris representatives exhorted Hansen to sign a standard Harris order form, he refused.

Hansen, however, did ask Chinn on September 10, 1982, to prepare a list of proposed contract terms which Hansen could then take back to Denver and present to his attorney and banker. Chinn prepared this memorandum on a piece of roll-stock paper, and Hansen then added two provisions and several asterisks. Chinn signed the document, but Hansen refused even to initial it. At the close of the discussion, the parties agreed to meet early the following week to negotiate further the sale of the M–1000 press.

Because Hansen was unable to arrange immediately his press business affairs, Harris and American Web did not meet again until Wednesday, September 15, 1982. At the commencement of this meeting, convened in the Denver office of Robert Loeb of Weigher & Fulton, attorney for plaintiff, Harris representatives announced that the press had already been sold to Perry Printing Company. The Publication Press Division of Harris had given Perry a right of first refusal on this M–1000 in late August, 1982. After flying to San Francisco and examining the press, Perry signed the Harris sales agreement form on September 14, 1982. This purchase contract was accepted by defendant on September 15, and the formal order was then signed by Harris on September 21, 1982. As a result of this sequence of events, the Commercial Press Division was unable to sell the used press to American Web on September 15, 1982.

Nonetheless, two backup contract proposals were discussed at this meeting in case the Perry deal disintegrated. One contract was prepared by Chinn and Melvin. The other contract proposal, which was drafted by Mr. Loeb, incorporated some provisions from the list prepared by Chinn and included other significant

---

**1.** American Web's representatives included two owner-managers, Gary Hansen, then Vice President in charge of finance and administration, now President, and Terry Choate, Manager in charge of manufacturing, and an independent maintenance machinist, Charles Kennemer, who was flown up from Los Angeles, by plaintiff.

**2.** Harris' representatives included Claude Chinn, salesman with Commercial Press; Kenneth Melvin, Used Equipment Manager, Commercial Press; and Ray Hartman, West Coast Representative, Commercial Press.

changes; it was accompanied by an American Web check for $20,000. These contracts, however, were never accepted by Harris and Web, and the check was returned to Hansen on September 24, 1982.

American Web commenced this suit on September 23, 1982, in state court in Denver against Harris Corporation and Perry Printing. The defendants removed the action to federal court. Plaintiff agreed to withdraw its early request for a temporary restraining order against moving the press from Pisani Carlisle Graphics and to dismiss Perry as a defendant. The only matter remaining is American Web's breach of contract claim against Harris.

## II

The pivotal issue raised by the facts in the case at bar is whether there was an enforceable sales contract between Harris and American Web as of September 10, 1982. In the absence of such an agreement, I must conclude that there was no breach of contract and that plaintiff is not entitled to damages. Alternatively, if there was a binding agreement, then I must determine whether enforcement of the contract is barred by the Statute of Frauds. Finally, since this case involves the sale of goods, these issues are governed by the Uniform Commercial Code.[3]

Plaintiff American Web asserts that it entered into a binding oral contract with Harris Corporation at the close of the inspection tour on September 10, 1982. It argues that both parties intended to be bound as of that date and characterizes all later meetings and discussions as merely efforts to work out fine details. Since this oral agreement predated the Perry Printing contract, American Web maintains that Harris' sale to Perry constituted a breach of plaintiff's contract.

Defendant contends that there was never an enforceable written or oral contract between American Web and Harris to purchase the used M–1000 press. The September-

ber 10, 1982, document was never meant to be an offer, as evidenced by its internally inconsistent terms. Nor was there ever an oral agreement based upon the parties' conduct. Finally, Harris suggests that both parties understood that in the event of a sale, a contract would be prepared the following week on a standard Harris order form.

Under the Uniform Commercial Code, "a contract for the sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract." U.C.C. § 2–204(1); *See Luria Bros. & Co., Inc. v. Pielet Bros. Scrap Iron & Metal, Inc.*, 600 F.2d 103, 108 (7th Cir.1979). The Code defines "contract" as the "total legal obligation which results from the parties' agreement as affected by the code and any other applicable rules of law." U.C.C. § 1–201(11). And an "agreement" "means the bargain of the parties in fact as found in their language or by implication from other circumstances including course of dealing or usage of trade or course of performance as provided by the Code." U.C.C. § 1–201(3).

To be sure, Article Two of the U.C.C. expands the traditional concept of a contract and imposes new and wider ranges of obligations. *See* White and Summers, *Handbook of the Law under the Uniform Commercial Code* (1980), p. 23. In keeping with this liberal trend, the Official Comment to the Code explains that if the parties intend to enter into a binding agreement and an appropriate remedy may be fashioned, then a contract for sale does not fail for indefiniteness if terms are left open. Official Comment to 2–204; *Kleinschmidt Division of SCM Corp. v. Futuronics Corp.*, 41 N.Y.2d 972, 395 N.Y. S.2d 151, 152, 363 N.E.2d 701, 702 (1977).

■ The Uniform Commercial Code, however, will not imply a basic agreement if the parties did not reach one. *Kleinsch-*

---

**3.** Whether California or Colorado law applies is of small consequence in interpreting the controlling U.C.C. provisions since they are the same. I therefore need not decide the conflicts question raised by these facts.

midt, *supra* at 152, 363 N.E.2d at 702. Section 2–204 still requires an agreement or a meeting of the minds between the negotiating parties. *Euclid Engineering Corp. v. Illinois Power Co.*, 79 Ill.App.2d 145, 223 N.E.2d 409, 413 (1967). But in place of a subjective test of intent, the Code focuses exclusively on "mutuality of assent as manifested by the conduct of the parties." *Cargill, Inc. v. Stafford*, 553 F.2d 1222, 1225 (10th Cir.1977); *Bradford v. Plains Cotton Cooperative Ass'n*, 539 F.2d 1249, 1253 (10th Cir.) *cert. denied* 429 U.S. 1042, 97 S.Ct. 743, 50 L.Ed.2d 754 (1976).

■ Turning now to the instant case, I find that there was no mutuality of assent between American Web and Harris on September 10, 1982. The evidence presented at trial, including the parties' conduct, surrounding circumstances, later events, and the specific items in the memorandum, establishes that no agreement was reached on that date. Specifically, Gary Hansen's refusal to sign the standard Harris form or the list of proposed contract terms is conduct which is inconsistent with plaintiff's contract theory. In addition, the parties' mutual decision to meet the following week to negotiate further the entire agreement reflects the preliminary character of the September 10 discussions. Finally, the inconsistent terms in the September 10 list lead me to find that this memorandum was only a proposal and not an offer. Whereas Chinn included the phrase "as is, where is" on the document, Hansen insisted on "press ready to print comparable to its condition in S.F." *See* § 2–316 and Official Comment 7, U.C.C.; *O'Neil v. International Harvester Co.*, 40 Colo.App. 369, 575 P.2d 862, 865 (1978). I recognize that disputes over material terms do not necessarily prevent the formation of a binding contract under § 2–204(3) of the U.C.C. Yet this is not the case when a dispute over a significant term manifests a lack of intention to contract. *Kleinschmidt, supra* at 152, 363 N.E.2d at 702. Here, the negotiating parties were merely assembling a list of potential provisions to be included in a final, written contract. I therefore hold that American Web and Harris did not enter into an enforceable sales contract on September 10, 1982.

■ In the alternative, I find that if any agreement was in fact reached on September 10, 1982, it was not binding on the parties. American Web and Harris did not intend to be bound by an oral agreement prior to drafting and executing a formal writing. *Coulter v. Anderson*, 144 Colo. 402, 357 P.2d 76 (1960); *Mohler v. Park City School District RE-2*, 32 Colo.App. 388, 515 P.2d 112, 114 (1973). Harris made clear to plaintiff that in accordance with its standard operating procedure, any formal offer by American Web had to be submitted on a printed Harris form. Such a writing, therefore, was not merely intended to memorialize a bargain already made. *Luria, supra* at 108; *Lambert Corp. v. Evans*, 575 F.2d 132, 135 (7th Cir.1978). Rather, it was a condition precedent to an enforceable contract. Further support for this conclusion can be found in the Restatement of Contracts (2nd), Section 27, where it states,

> if either party knows or has reason to know that the other party regards the agreement as incomplete and intends that no obligation shall exist until other terms are asserted to or until the whole has been reduced to another written form, the preliminary negotiations and agreements do not constitute a contract. Comment b (1979 ed.).

Accordingly, I conclude that there was no binding contract between plaintiff and defendant on September 10, 1982.

### III

Even if there was a valid September 10 agreement between Web and Harris, plaintiff is not entitled to relief because enforcement of such contract is barred by the Statute of Frauds.

The Statute of Frauds provides in relevant part that,

> (1) [e]xcept as otherwise provided in this section, a contract for the sale of goods for the price of $500 or more is not

enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker. A writing is not insufficient because it omits or incorrectly states a term agreed upon, but the contract is not enforceable under this paragraph beyond the quantity of goods shown in such writing. U.C.C. § 2–201.

This section makes clear that *the* contract for the sale of goods need not be reduced to writing. *Impossible Electronics Techniques, Inc. v. Wackenhut Protective Systems, Inc.,* 669 F.2d 1026, 1033 (5th Cir. 1982). Moreover, the writing need not state with absolute precision all of the material terms. "What is required is that the writing afford a basis for believing that the offered oral evidence rests on a real transaction." *N. Dorman & Company, Inc. v. Noon Hour Food Products, Inc.,* 501 F.Supp. 294, 296 (E.D.N.Y.1980).

The Official Comment to § 2–201 delineates three invariable requirements which if satisfied, take the agreement out of the Statute of Frauds. First, it must specify quantity. Second, it must be "signed"; a word which includes any authentication which identifies the party to be charged. Finally, it must evidence a contract for the sale of goods. *See Nations Enterprises, Inc. v. Process Equipment Co.,* 40 Colo. App. 390, 579 P.2d 655, 658 (1978); *Impossible Electronics, supra* at 1034; *Dorman, supra* at 297; *and Cavalier Mobile Homes, Inc. v. Liberty Homes, Inc.,* 53 Md.App. 379, 454 A.2d 367, 376 (1983).

■ Here, the first two prongs are easily met. The September 10 memorandum on roll paper included a provision for the sale of one used M–1000 printing press. It was also signed by an agent of the party to be charged, Claude Chinn, Salesman, Commercial Press Division of Harris Corporation.

The third requirement, however, is not satisfied in the case at bar. According to the court in *Dorman, supra,* the disposi-tive inquiry is "whether the writings, considered as a whole, evidence by 'reasonable construction and necessary implication a contract for the sale of goods.' " *Id.* at 297, *quoting Morris Cohon & Co. v. Russell,* 23 N.Y.2d 569, 297 N.Y.S.2d 947, 245 N.E.2d 712 (1969). In *Dorman,* a cheese importer and distributor sought damages against another dealer for breach of an alleged agreement relating to the use of two Canadian import licenses. The court reluctantly found that although a verbal agreement was reached on November 24, 1978, the writings did not evidence a contract for the sale of goods. It observed that "[a]t best, these writings may be regarded as evidence of preliminary negotiations...." *Id.* at 298; *See FMC Finance Corp. v. Reed,* 592 F.2d 238, 243 (5th Cir. 1979); *In re Flying W. Airways, Inc.,* 341 F.Supp. 26, 72 (E.D.Pa.1972).

The September 10 memorandum reflects that American Web and Harris were still negotiating and "so long as negotiations are still in progress, there cannot be an adequate written memorandum for purposes of the statute of frauds." Bender's Uniform Commercial Code Service, 3 Sales & Bulk Transfers, § 2–204(1), at 2–45; *In re Flying Airways, supra* at 72. The proposed terms of sale included a heading "on contract", the phrase "$20,000 with contract," and a statement that "contract to be backed up by a letter of credit for full amount." The memo also contained two inconsistent terms, "as is, where is," and "press ready to print comparable to its S.F. counterpart." In summary, the September 10 document fails to evidence a contract and therefore to satisfy the Statute of Frauds; this, in turn, renders the purported agreement unenforceable.

IV

■ The final issue to consider is defendant's request for attorneys' fees pursuant to C.R.S. § 13–17–101 *et seq.* (1982 Supp.) Harris insists that plaintiff's claims were maintained frivolously and without good faith and asks to be reimbursed for all

legal fees incurred after October, 1982, in defending this case.

I do not agree with Harris' characterization of this lawsuit. There were genuine issues of material fact and meritorious disputes regarding the legal consequences of the parties' conduct. Moreover, there was conflicting testimony regarding important conversations during the contract negotiations. Thus, American Web will not be required to reimburse defendant for its legal fees.

### CONCLUSION

For the foregoing reasons, I hold that defendant, Harris Corporation, is not liable to plaintiff, American Web Press, Inc., for breach of contract. In accordance with this ruling, the complaint is dismissed and the trial on the issue of damages is vacated.

Each party shall bear its own costs.

Judgment shall be entered accordingly.