Sevel ARGENTINA, S.A., Plaintiff,

v.

GENERAL MOTORS CORPORATION and General Motors Overseas Distribution Corporation, Defendants.

No. 95 CIV. 7725(JES).

United States District Court,
S.D. New York.

April 28, 1999.

---

Menaker & Herrmann, LLP, New York, NY, Richard Menaker, Paul M. Hellegers, Of Counsel, for Plaintiff.

Dorsey & Whitney LLP, New York, NY, Richard H. Silberberg, Robert G. Manson, Of Counsel, Bingham Dana LLP, Boston, MA, Daniel Goldberg, William N. Berkowitz, Alicia L. Downey, Of Counsel, General Motors Corporation, Detroit, MI, Lawrence S. Buonomo, Of Counsel, for Defendants.

## MEMORANDUM OPINION AND ORDER

SPRIZZO, District Judge.

Sevel Argentina, S.A. ("Sevel") brings this action against General Motors Corporation and General Motors Overseas Distribution Corporation ("GMODC") (collectively, "GM") alleging damages from the breach of various contracts and implied covenants, and, in the alternative, asserting claims for *quantum meruit* and unjust enrichment.[1] Pursuant to Fed.R.Civ.P. 56, GM moves for summary judgment, arguing, *inter alia*, that Sevel's claims are meritless and contradicted by the express terms of the relevant contracts and documents. For the reasons set forth below, defendants' motion for summary judgment is granted.

## BACKGROUND

### The 1984 Contracts

In 1984, Sevel and GM entered into a set of contracts under which GM gave Sevel the right to purchase "C–10" pick-up truck component kits from GM for assembly and sale in Argentina under GM's *Chevrolet* industry name. *See Amended Complaint* dated November 22, 1995 ("*Am.Compl.*")

---

1. Sevel has voluntarily dismissed Count III of its Amended Complaint which asserts a claim for damages resulting from overcharges by GM in the supply of components. *See Plaintiff's Memorandum in Opposition to Defendants' Second Motion for Summary Judgment* dated May 22, 1998 ("*Pl.'s Mem.*") at 12.

¶¶ 12–14; *see also Declaration of Albert J. Buchanan* dated April 20, 1998 (*"Buch.Decl."*) *Exh. A* (Supply Agreement dated May 16, 1984), *Exh. B* (Marketing Agreement dated May 15, 1984), *Exh. C* (Trademark License Agreement dated May 15, 1984), *Exh. D* (Technical Information and Assistance Agreement dated May 17, 1984) (collectively, the "1984 Contracts"). The 1984 Contracts contained explicit provisions regarding amendments or other agreements purported to be effective or performed following their expiration or termination. Sevel and GM agreed that such amendments or agreements would be binding only when they were in writing and executed by duly authorized representatives of both parties.[2] *See Buch. Decl. Exh. A, Art. 23* at 21; *Exh. B, Art. 18* at 17; *Exh. C, Art. 14* at 13; *Exh. D, Art. 23* at 24. Unless previously terminated, the 1984 Contracts would expire by their terms on May 15, 1990.[3] *See Buch. Decl. Exh. A, Art. 28* at 23–24; *Exh. B, Art. 12* at 16; *Exh. C, Art. 8* at 6–7; *Exh. D, Art. 15* at 17.

In the event GM discontinued the manufacture or sale of the "C–10" model while the 1984 Contracts were still in effect, Article 14 of the Supply Agreement ("Article 14") states that GMODC shall provide written notice to Sevel not less than nine months in advance. *See Buch. Decl. Exh. A, Art. 14* at 15–16. Upon such notice, Article 14 provides that the parties "will evaluate the possibility to amend" the 1984 Contracts.[4] *See id.* at 16. However, "GMODC shall have no further obligation under" the 1984 Contracts to provide "C–10" components or components for "any other model." *Id.*

Similarly, in the event GM decided to manufacture any other *Chevrolet* vehicle in Argentina, Article 1B of the Marketing Agreement ("Article 1B") provides that GMODC shall notify Sevel "and the parties shall have one hundred and eighty (180) days from such notice in which to negotiate an agreement concerning SEVEL's participation" in that project. *See Buch. Decl. Exh. B, Art. 1B* at 4. However, Article 1B mandates that "[u]ntil the terms of such agreement are fully negotiated, or if for any reason such agreement is not reached within the one hundred and eighty (180) day period, neither party shall have any further legal obligation to the other party with respect to such additional vehicle project." *Id.*

On May 15, 1990, the 1984 Contracts expired by their terms. *See Am. Compl.* ¶ 28; *see also Buch. Decl.* at 6. Thereafter, the parties executed a new contract ("1990 Contract"), agreeing to reinstate the terms of the 1984 Contracts until December 31,

---

2. All four agreements comprising the 1984 Contracts contained the following provision regarding amendments to the contracts:

   [n]o other agreement or amendment to this Agreement which purports to impose obligations at variance with this Agreement, or which purports to impose definite obligations upon either party not specifically imposed by this Agreement, or which purports to be effective or performed following the expiration or termination of this Agreement shall be binding unless it is in writing and is executed by duly authorized representatives of Sevel and GMODC.

   *Buch. Decl. Exh. A, Art. 23* at 21; *Exh. B, Art. 18* at 24; *Exh. D, Art. 23* at 24; *see also Exh. C, Art. 14* at 13 (same except refers to parties as "GM and Sevel").

3. Upon expiration, automatic renewal of the 1984 Contracts for a five year term would occur only if Sevel had fulfilled a number of conditions which the parties concede were not met. *See Buch. Decl.* at 6; *Pl.'s Mem.* at 6.

4. Article 14 states, in relevant part, that:

   [i]n the case the model covered by this Agreement is discontinued GMODC and SEVEL *will evaluate the possibility to amend this Agreement* in order to include the production and marketing in Argentina of another pick-up truck model under the same conditions regarding pricing policies, payment and foreign exchange terms for components, Technical Information and Assistance Commission and Technicians [sic] Expenses.

   *Buch. Dec. Exh. A, Art. 14* at 16 (emphasis added).

1990.[5] *See Defendants' Memorandum of Law in Support of their Motion for Summary Judgment* dated April 20, 1998 (*"Defs.' Mem."*) at 5. Sevel maintains it agreed to extend the 1984 Contracts upon the "express understanding" that a new arrangement would be negotiated under which GM would compensate Sevel for its losses sustained under the 1984 Contracts in reintroducing GM into the Argentine market by allowing Sevel to manufacture and sell newer vehicle models, such as the "C–20" pick-up truck, instead of the "obsolete C–10." *See Am. Compl.* ¶¶ 28–29. In furtherance of this goal, Sevel claims it performed marketing studies, preparatory analyses, and built a prototype "C–20" pick-up truck, all at GM's request. *See id.* ¶ 29. However, Sevel alleges that towards the end of 1990, GM entered into secret negotiations with Sevel's competitor, Renault Argentina ("Renault"), for the sale of various GM models in Argentina, including the *Chevrolet Bonanza* and *Chevrolet Veraneio* sport utility vehicles, which would compete in the same market as the "C–10" pick-up truck.[6] *See Pl.'s Mem.* at 6–7; *see also Am. Compl.* ¶¶ 30–34.

*The June 20, 1991 Letter*

On March 11, 1991, GM notified Sevel that it was prepared to continue its relationship regarding the "C–10" pick-up truck and requested Sevel's "acceptance in principle of this proposal." *Buch. Decl. Exh. I* (Letter from GMODC Executive Vice President Albert J. Buchanan to Sevel Vice President Dr. Jorge Blanco Villegas dated March 11, 1991). The letter called for the parties "to negotiate the terms of the new relationship." *Id.*

On April 5, 1991, Sevel responded that it "would evaluate [GM's] proposal," and expressed its "surprise" that GM had entered into an agreement with Renault regarding the *Chevrolet Veraneio* sport utility truck, which Sevel maintained "has the characteristics to compete" in the same market as the "C–10." *Buch. Decl. Exh. J* at 1–2 [unnumbered] (Letter from Sevel Vice President Dr. Jorge Blanco Villegas to GMODC Executive Vice President Albert J. Buchanan dated April 5, 1991). Ten days letter, Sevel notified GM that it was "not able to accept an extension of the licensing agreement for the manufacturing and marketing of the C–10 pick-up." *Buch. Decl. Exh. J* at 3–4 [unnumbered] (Letter from Sevel Vice President Dr. Jorge Blanco Villegas to GMODC Executive Vice President Albert J. Buchanan dated April 15, 1991). Sevel cited GM's agreement with Renault as the reason for its rejection, and requested that the parties mutually agree upon a date for terminating the parties relationship with respect to the "C–10"[7] *Id.*

On June 20, 1991, GM "offer[ed]" Sevel the importation of the Brazilian manufactured, fully assembled *Chevrolet Veraneio* and *Chevrolet Bonanza* sport utility vehicles and component kits for the assembly of "C–20" pick-up trucks. *See Buch. Decl.*

---

5. GM contends that when the 1990 Contract expired by its terms, the parties preliminarily discussed the possibility of future relations but no specifics were agreed upon and the parties did not execute a written agreement extending the 1984 Contracts further. *See Defendants' Memorandum of Law in Support of their Motion for Summary Judgment* dated April 20, 1998 (*"Defs.' Mem."*) at 5. Sevel maintains that although "specific drafts ... were never finalized into signed final renewal or extension agreements," *Transcript of Oral Argument* dated June 26, 1998 (*"June 26, 1998 Tr."*) at 17–18, the parties continued their relationship under the 1984 Contracts and the 1990 Contract until November of 1991. *See Pl.'s Mem.* at 7.

6. Sevel maintains that it had engaged in negotiations with GM regarding these same trucks, *see Am. Compl.* ¶ 37, and that GM deceptively used Sevel to maintain a presence in Argentina until its new relationship with Renault was established. *See id.* ¶¶ 30–31.

7. Although it can point to no written document executed by both parties, *see Transcript of Oral Argument*, dated June 26, 1998 (*"June 26, 1998 Tr."*) at 17–18, Sevel maintains that the 1984 Contracts were "extended for another three months beyond the end of 1990," *Am. Compl.* ¶ 33, and later "renewed for another three months beyond March 1991." *Id.* ¶ 38.

*Exh. K* (Letter from GMODC Executive Vice President Albert J. Buchanan to Sevel Vice President Dr. Jorge Blanco Villegas dated June 20, 1991) (hereinafter, the "June 20, 1991 Letter"); *see also Am. Compl.* ¶¶ 40–41. GM asked Sevel to advise it of Sevel's "acceptance in principle of this proposal" and of Sevel's "availability to negotiate the terms of this new relationship." *Id.* Sevel maintains that it accepted GM's offer in principle, and the parties immediately entered into negotiations regarding the details while agreeing to a brief extension of the "C–10" program so as to maintain GM's presence in Argentina. *See Am. Compl.* ¶¶ 43–44. However, the parties never executed a formal agreement pursuant to this letter. *See Transcript of Oral Argument*, dated June 26, 1998 (*"June 26, 1998 Tr."*) at 25–27. Instead, Sevel entered into a separate agreement with GM subsidiary GM Do Brasil ("GMB") for the importation of fully-built "C–20" pick-ups and *Chevrolet Veraneio* sport utility vehicles. *See Buch. Decl.* at ¶ 19, *Exh. L* (Agreement of Exportation, Importation and Commercialization between GMB and Sevel) (hereinafter, the "GMB Contract").[8] In October of 1991, GM announced the worldwide discontinuance of the "C–10" pick-up truck. *See Am. Compl.* ¶ 46.

From 1992 through 1993, Sevel claims that GM intentionally delayed and stalled the parties' negotiations for the long-term licensing of the production of "C–20" pick-up trucks in Argentina as promised in the June 20, 1991 Letter. *See Am. Compl.* ¶¶ 47–52. Sevel claims that GM once again entered into secret negotiations with one of its competitors, CIADEA S.A. (Formerly Renault), for a joint venture under which GM and CIADEA would manufacture and sell "C–20" pick-up trucks in

Argentina. *See id.* ¶ 49. On May 10, 1993, GM announced its joint venture with CIADEA. *Id.* ¶ 50. On December 31, 1993, the GMB contract expired by its terms and all business relations between GM and Sevel terminated. *Id.* ¶ 51.

*Sevel's claims Against GM*

Sevel asserts four claims against GM: (1) for breach of the 1984 Contracts, specifically Article 14 of the Supply Agreement, *see supra* at 263, breach of Article 1B of the Marketing Agreement, *see id.* and breach of the implied covenants of good faith and fair dealing, *see Am. Compl.* ¶ 55; (2) for breach of the June 20, 1991 Letter agreement, *see id.* ¶¶ 57–61; and in the alternative, (3 & 4) for *quantum meruit* and unjust enrichment. *Id.* ¶¶ 65–71.

Sevel maintains that GM was obliged under the 1984 Contracts to grant Sevel a reasonable, good faith opportunity to obtain the rights to manufacture and to distribute "C–20" pick-up trucks in Argentina.[9] *See Am. Compl.* ¶ 54. Sevel claims that since GM decided during the life of the 1984 Contracts, as extended, to discontinue the "C–10" model and to produce new models in Argentina, it was obligated under Articles 14 and 1B and the implied covenants of good faith and fair dealing to engage in negotiations with Sevel regarding its involvement in the production of the new models. *See id.* ¶ 55. Further, Sevel asserts that the parties entered into a contract by virtue of the June 20, 1991 Letter, which GM breached when it negotiated a joint venture with CIADEA to manufacture "C–20" pick-up trucks in Argentina. *Id.* ¶¶ 50–52, 58–60. Alternatively, Sevel asserts claims in *quantum meruit*[10] and unjust

---

8. Sevel does not assert any claims under the GMB Contract.

9. Sevel claims that GM violated its obligations when it entered into secret negotiations with CIADEA and when it broke off negotiations on the pretext that one of Sevel's production

facilities was inadequate. *See Am. Compl.* ¶ 54.

10. Sevel claims that its "perseverance" with the "C–10" program "conferred a variety of benefits on GM," *Am. Compl.* ¶ 66, and that its investments of time and money were made with the expectation that it would be "com-

enrichment[11], for its efforts and expenditures in maintaining the continuity of GM's presence in Argentina during 1990–1993, should the Court find that this "matter is not covered by contract." *Am. Compl.* ¶¶ 66–68, 70–72; *see also Pl.'s Mem.* at 21.

## GM's Motion for Summary Judgment

GM moves for summary judgment, arguing, *inter alia*, that (a) the 1984 Contracts and 1990 Contract had terminated by the time GM came out with its plans to introduce the "C–20" pick-up truck in Argentina, and that, therefore, there could be no breach of Articles 14 and 1B; *see Defs.' Mem.* at 10–14; (b) GM did not breach its implied covenant of good faith and fair dealing because (I) Sevel chose to continue manufacturing the "C–10" pick-up model, (ii) the parties engaged in typical business negotiations, and (iii) GM reserved the right to sell other products without Sevel's participation, *see id.* at 16–17; (c) the June 20, 1991 Letter could not have been a contract because the language of the letter indicates GM's intent not to be bound until a contract had been formally executed,[12] and no written agreement as to the material terms of the contract was ever executed by the parties,[13] *see id.* at 17–19; and (d) Sevel's *quantum meruit* and unjust enrichment claims must be dismissed because New York law does not permit quasi-contractual relief where the benefits for which compensation is sought are the subject of a contract. *Id.* at 20.

## DISCUSSION

*Sevel's Failure to Present Evidence of Causation with respect to its alleged Damages*

■ Under New York law " 'an action for breach of contract requires proof of (1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages' " resulting from the breach. *See First Investors Corp. v. Liberty Mut. Ins. Co.*, 152 F.3d 162, 168 (2d Cir.1998) (*quoting Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525 (2d Cir.1994).) With respect to the 1984 Contracts, as extended, Sevel has failed to establish the fourth element of its *prima facie* case.

In an answer to one of GM's interrogatories, Sevel identified its losses under the "C–10" program as falling into four categories, (1) operating losses from assembly and sale of "C–10" pick-up trucks ($20,-654,300); (2) losses from unrecovered start-up costs ($4,734,000); (3) losses on fixed asset purchases ($12,329,998); and (4) costs related to financing losses and

---

pensated in the end with profitable, long-term licenses to manufacture and distribute successor vehicles." *Id.* ¶ 67. Thus, Sevel seeks *quantum meruit* damages, to be determined at trial, equal to the value of the benefits bestowed upon GM and the cost to Sevel "of its investment on GM's behalf." *Id.* ¶ 68.

**11.** Sevel seeks compensation for benefits "unjustly accruing to GM from its capture of a substantial segment of the Argentine market in direct competition with SEVEL." *Am. Compl.* ¶ 71.

**12.** GM points to the language of the June 20, 1991 Letter requesting Sevel's "acceptance in principle" and "availability to negotiate the terms" of the new agreement as indicia of its intent not to be bound until a formal document had been executed. *See Defs.' Mem.* at 17–18; *see also Buch. Decl. Exh. K.*

**13.** Sevel counters that the material terms of this contract were agreed upon at a meeting one day before on June 19, 1991, and that this letter merely memorializes their agreement. *See Pl.'s Mem.* at 8. Further, Sevel raised at oral argument the "eleventh hour" argument that Sevel's rejection by letter dated April 15, 1991, *see Buch. Decl. Exh. J* at 3–4 [unnumbered], of GM's earlier offer encompassing only "C–10" model pick-up trucks, *see Buch. Decl. Exh. I*, when combined with Sevel's letter dated April 5, 1991 wherein Sevel stated it would evaluate GM's offer to continue the "C–10" program and expressed its "surprise" at GM's agreement with Renault regarding the *Chevrolet Veraneio, see Buch. Decl. Exh. J* at 1–2 [unnumbered], was, in fact, a counter-offer demanding that the *Veraneio* be included in any future relationship, and that the June 20, 1991 Letter acted as confirmation of GM's binding acceptance of that counter-offer at the June 19, 1991 meeting. *See June 26, 1998 Tr.* at 28–30.

fixed assets ($15,389,765). *Berkowitz Decl. Exh. J* (Plaintiff's Response to Defendants' Second Set of Interrogatories dated December 31, 1997 (*"Pl.'s Response to Defs.' Interrogs."*) at 2. *See Declaration of William N. Berkowitz* dated April 17, 1998 (*"Berkowitz Decl."*) *Exh. J* (Plaintiff's Response to Defendants' Second Set of Interrogatories dated December 31, 1997 (*"Pl.'s Response to Defs.' Interrogs."*)) at 2. Sevel also noted that an "[a]lternative measure of damages would be the profits earned by [GM] . . . in Argentina as a result of Sevel's facilitating their reentry to that market." *Id.*

However, Sevel's Fed.R.Civ.P. 30(b)(6) designated damages witness testified that he was not aware of any other damages calculation aside from Sevel's computation of its four categories of losses under the "C–10" program. *See Berkowitz Decl. Exh. F* (Transcript of Deposition of Victor Franzosi dated February 27, 1998 (*"Franzosi Dep."*)) at 36–40. Moreover, this witness could not identify any lost sales or increased expenses attributable to any misconduct, omission or breach of contract by GM. *See id.* at 92 (increased direct labor costs incidental to production of "C–10"s); *see id.* at 97–98 (Sevel over anticipated volume thus structural costs per vehicle increased); *see id.* at 99–100 (no knowledge whether Sevel had any lost sales due to conduct or omission by GM); *see id.* at 100–01 (cost of local materials higher than originally forecasted); *see id.* at 120–21 (when evaluated at contribution margin level, "C–10" program profitable to Sevel from 1985 through 1991); *see id.* at 136–37, 139 (operating expenses and investment in fixed assets were "necessary and appropriate" to properly assemble and market the "C–10" and witness had no

knowledge of any conduct or omission by GM that caused Sevel to incur these expenses). Thus, with respect to the four remaining categories of losses identified by Sevel as its damages under the 1984 Contracts, as extended—operating losses from the assembly and sale of "C–10" pick-ups, unrecovered start-up costs, losses caused by fixed asset purchases, and costs related to financing losses and fixed assets, *see supra* n. 15—Sevel's Rule 30(b)(6) witness completely negated causation. Since New York law conditions the recovery of breach of contract damages upon plaintiff's showing that those damages resulted from defendant's breach, *see Tagare v. NYNEX Network Sys. Co.*, 921 F.Supp. 1146, 1149–50 (S.D.N.Y.1996); *Reuben H. Donnelley Corp. v. Mark I Marketing Corp.*, 893 F.Supp. 285, 290 (S.D.N.Y.1995); *R.H. Damon & Co. v. Softkey Software Products, Inc.*, 811 F.Supp. 986, 991 (S.D.N.Y.1993); *see also Travellers Int'l. A.G. v. T.W.A., Inc.*, 41 F.3d 1570, 1577 (2d Cir.1994) (lost profits must be directly traceable to defendant's conduct and capable of proof with reasonable certainty), Sevel's breach of contract damages claims raised under the 1984 Contracts, as extended, fail as a matter of law.[14]

In any event, even if Sevel had established that GM's breach caused its damages, the documents at issue preclude Sevel's recovery of damages. Where, as here, a court is called upon to examine the dealings between "two sophisticated business entities," *see Buch. Decl. Exh. A, Art. 13A* (Supply Agreement dated May 16, 1984), then analysis should begin with the contracts themselves.

*The 1984 Contracts*

■ The 1984 Contracts, as extended by the 1990 Contract, expired by their terms

---

**14.** Sevel seeks to have this Court, in effect, rewrite the 1984 Contracts and make it more profitable for them. Further, instead of the provisions in the 1984 Contracts where GM was merely obliged to negotiate with Sevel its involvement in successor vehicles, Sevel seeks to have this Court infer that the parties actually intended to mandate that Sevel would, in the end, receive profitable long-term licenses.

However, especially since Sevel has acknowledged in these very contracts that it is a "sophisticated business entit[y]" *Buch. Decl. Exh. A, Art. 13A.* However, the Court cannot and will not rewrite these contracts. Thus, Sevel's profits under the 1984 Contracts and GM's corresponding obligations thereafter are limited to the benefits for which the parties bargained as contained in those documents.

on December 31, 1990. While Sevel can point to no written, executed document which extends the 1984 Contracts past that date, *see Pl.'s Mem.* at 7, Sevel argues that where a contract expires by its terms and the parties continue to perform under the terms of that contract, the court should infer an extension of the contract. *See June 26, 1998 Tr.* at 18; *see also Pl.'s Mem.* at 13–14. Thus, the 1984 Contracts were extended past December 31, 1990, until the end of November 1991 by virtue of Sevel's continuing to order "C–10" component kits and GM's continuing to fill those orders. *See Pl.'s Mem.* at 7.

However, Sevel's reliance upon *Martin v. Campanaro,* 156 F.2d 127 (2d Cir.), *cert. denied,* 329 U.S. 759, 67 S.Ct. 112, 91 L.Ed. 654 (1946), is misplaced. In *Martin,* the Court of Appeals held that where an agreement expires by its terms, and *"without more,"* *id.* at 129 (emphasis added), the parties continue to perform, "an implication arises that they have mutually assented to a new contract containing the same provisions as the old." *Id.* The existence of this "contract implied in fact," *id.,* is determined using the "reasonable person" test. *See id.* Here, however, there is "more" indeed. The *Martin* court also found that were, as here, the parties had engaged in "subsequent unsuccessful negotiations" to enter into a new contract, a reasonable person would not believe that the parties intended to form new contract extending the terms of the old. *See id.* at 129–30. Moreover, were the Court to imply that the parties assented to a new contract extending the 1984 Contracts past December 30, 1991, four separate provisions of the 1984 Contracts—Article 23 of the Supply Agreement, Article 18 of the Marketing Agreement, Article 14 of the Trademark License Agreement and Article 23 of the Technical Information and Assistance Agreement—mandate that no agreement purporting to be effective following the expiration of the 1984 Contracts is binding unless it is in writing and executed by representatives of both parties. *See supra* n. 2. Since Sevel has acknowledged that it can point to no such document, *see Pl.'s Mem.* at 7, it is clear that the 1984 Contracts, as extended by the 1990 Contract, expired by their terms on December 31, 1990.

■ Sevel has plead that GM violated Article 14, Article 1B and the covenants of good faith and fair dealing by discontinuing the "C–10" pick-up truck, *see Am. Compl.* ¶ 55, and secretly negotiating with CIADEA regarding the manufacture of "C–20" pick-up trucks in Argentina. *See id.* ¶ 54. Sevel alleges that GM announced the discontinuance of the "C–10" model in October of 1991, *id.* ¶ 46, and that GM's secret negotiations with CIADEA occurred during 1992–1993. *Id.* ¶¶ 49–50. Thus, Sevel has affirmatively plead that the very activities it claims constitute a breach of the 1984 Contracts took place after the 1984 Contracts, as extended by the 1990 Contract, had expired on December 31, 1990. When the 1984 Contracts expired, so too, did GM's obligations under that contract. Thus, Sevel's breach of good faith contract claims under the 1984 Contracts must be dismissed.[15]

*The June 20, 1991 Letter*

■ Sevel's contention that it entered into an agreement with GM by virtue of

15. In addition, Article 14's nine month notice requirement could not have been triggered because the contract was no longer in effect nine months prior to October 1991. Thus GM was under no obligation to "evaluate the possibility to amend" the 1984 Contracts, and there could be no breach. Moreover, the language of Article 14, wherein the parties "will evaluate the possibility to amend" the 1984 Contracts, is merely an agreement to agree, which is unenforceable under New York law. *See Joseph Martin, Jr. Deli. Inc. v. Schumacher,* 52 N.Y.2d 105, 109–11, 436 N.Y.S.2d 247, 417 N.E.2d 541 (1981) (clause which provided "annual rents to be agreed upon" was unenforceable agreement to agree); *Cf. Thompson v. Liquichimica of America, Inc.,* 481 F.Supp. 361 (S.D.N.Y. 1979) (provision in letter stating "it was understood that all parties would exercise their best efforts to reach an agreement" was unenforceable agreement to agree).

the June 20, 1991 Letter must fail as a matter of law since by its very terms the letter cannot be construed to be an enforceable contract. The June 20, 1991 Letter from GM Executive Vice President Albert J. Buchanan to Sevel's Vice President Dr. Jorge Blanco Villegas merely extended an "offer" by GM to Sevel for the importation of the new *Chevrolet* models. *See Buch. Decl. Exh. K.* This letter explicitly asks Sevel for its "acceptance in principle of this *proposal*," *id.* (emphasis added) and expresses GM's desire "to negotiate the terms of this new relationship." *Id.* The letter fails to address any material terms such as price, quantity, and the timing of the contract—essential contractual components which would have manifested GM's intention to be bound. *See 166 Mamaroneck Ave. Corp. v. 151 East Post Rd. Corp.,* 78 N.Y.2d 88, 91–92, 571 N.Y.S.2d 686, 575 N.E.2d 104 (1991); *see also Cobble Hill Nursing Home, Inc. v. Henry & Warren Corp.,* 74 N.Y.2d 475, 482–83, 548 N.Y.S.2d 920, 548 N.E.2d 203 (1989), *cert. denied,* 498 U.S. 816, 111 S.Ct. 58, 112 L.Ed.2d 33 (1990); RESTATEMENT (SECOND) OF CONTRACTS § 33 (1981) (terms of a contract must be reasonably certain).

Sevel argues that the June 20, 1991 Letter was actually a confirmation of an oral agreement reached at a meeting the day before on June 19, 1991. *See June 26, 1998 Tr.* at 23. That contention lacks merit. While the letter does state that it "confirm[s] our *conversation* of Wednesday, June 19," *Buch. Decl. Exh. K* (emphasis added), it does not use terms such as "agreement" or "contract" which would indicate that the parties had already entered into a binding contract. Moreover, Sevel

has failed to produce any documentation to substantiate its acceptance in principle of GM's offer.[16]

In any event, Sevel's argument that it verbally accepted GM's offer extended in the June 20, 1991 Letter at a meeting the day before is refuted by the very language of the letter itself. *See June 26, 1998 Tr.* at 23. First, the language of the letter talks of "offer[s]," terms to be "negotiate[d]," and asks whether Sevel "accept[s] ... this proposal" in principle. *See Buch. Exh. K.* Such language is inconsistent with any notion that there was an agreement reached the day before. *See* N.Y.U.C.C. LAW § 2–201(1) (McKinney 1993); *see, e.g., N. Dorman & Co., Inc. v. Noon Hour Food Products, Inc.,* 501 F.Supp. 294 (E.D.N.Y.1980) (although writings were signed and stated quantity, they did not evidence a contract for the sale of goods).

Equally unpersuasive is Sevel's argument that it believed that there was no need to give any further acceptance because it was "understood" that there had been an agreement. *See June 26, 1998 Tr.* at 26–27; *see also.* Declaration of Domenico Ferraris dated May 22, 1998 ("*Ferraris Decl.*") ¶ 14 at 7 (GM's request to be advised of Sevel's "acceptance in principle" was merely "a formality").[17] Both these "sophisticated parties" had twice before negotiated and executed written documents representing their intentions to be bound and defining their relationship under the 1984 Contracts and 1990 Contract. In the face of that past history, the Court cannot accept Sevel's claim that Sevel's formal acceptance as requested in GM's offer was "understood," nor could a rea-

---

**16.** The only document which Sevel identifies is a draft of the BMB contract, *see June 26, 1998 Tr.* at 31–32, under which Sevel assets no claims and which specifically states that "the present agreement ... substitute[s] any other previous agreements between GMB and SEVEL" regarding the "C–20" and *Veraneio* models. *See Buch. Decl. Exh. L, Art. 32.2* at 18.

**17.** Although during Oral Argument Sevel identified Exhibit Y to the Declaration of Ivan De Nadai as proof that Sevel had accepted GM's offer, *see June 26, 1998 Tr.* at 27, that facsimile letter applies to the GMB contract under which Sevel asserts no claims. *See* Declaration of Ivan De Nadai dated May 21, 1998 ("*De Nadai Decl.*") *Exh. Y* (Facsimile Letter from Miguel A. Felippa, Executive Engineer, GMB Ltda., to Roberto F. Carena, CORMEC S.A., (July 23, 1991)).

sonable fact finder sustain that finding on that basis.

Alternatively, Sevel argues that GM's June 20, 1991 Letter acted as GM's acceptance of a counter-offer made by Sevel. Sevel claims that GM's original offer in March of 1991 encompassing only the "C–10" pick-up, *see Buch. Decl. Exh. I,* was rejected in Sevel's letter of April 15, 1991, *see Buch. Decl. Exh. J,* which when read in conjunction with Sevel's letter dated April 5, 1991, *see id.,* constitutes Sevel's counter-offer that the parties would have a deal if GM included the *Veraneio* model as well. *See June 26, 1998 Tr.* at 30; *see also Ferraris Decl.* ¶¶ 10–14 at 4–7. Sevel argues that the mention of this new model in the June 20, 1991 Letter reflects what the parties discussed at the meeting the previous day, thereby evidencing GM's acceptance of Sevel's counteroffer. *See June 26, 1998 Tr.* at 31. However, this theory also fails as a matter of law. The June 20, 1991 Letter contains no indication whatsoever that GM was accepting a counteroffer made by Sevel and entering into a valid contract. *See Buch. Decl. Exh. K.* In fact, even the subject matter of the correspondence is not the same. *Compare Buch. Decl. Exh. K* (GM's June 20, 1991 Letter offered Sevel the *Veraneio, Bonanza* and "C–20" models) *with Buch. Decl. Exh. I* (GM's March 11, 1991 letter offered Sevel only the "C–10" model). Further, Sevel's Letter dated April 15, 1991 makes no mention of a counteroffer or that the inclusion of the *Veraneio* model would be a prerequisite to the parties entering a new contract. *See Buch. Decl. Exh. J* at 3–4 [unnumbered]. Therefore, Sevel's argument that its mention of the *Veraneio* in its April 5, 1991 letter to GM constituted a counter demand is simply unsupported by

the language of the letter. *See id.* at 1–2 [unnumbered].

Lastly, Sevel's argument that under the factors identified by Judge Leval in *Teachers Ins. & Annuity Ass'n v. Tribune Co.,* 670 F.Supp. 491 (S.D.N.Y.1987), the parties entered into a binding preliminary agreement by virtue of the June 20, 1991 Letter must also be rejected. As discussed in detail above, the language of the June 20, 1991 Letter clearly indicates that GM did not intend "to be bound until the conclusion of final formalities." *Teachers,* 670 F.Supp. at 499. Further, the letter lacked such essential material terms as price, quantity, and the timing of the contract, and was not the customary form that the parties had utilized for previous transactions. *Id.* at 501–503. Moreover, the witness identified by Sevel as the person that "orally accepted" GM's offer in principle, *see Berkowitz Decl. Exh. I* at 2 (Pl's Response to Defs.' First Set of Interrogs. dated Jan. 12, 1995 ¶ 12)("Domenico Ferraris orally accepted the offer in principle"), testified that he had no knowledge of any such "acceptance." *Id. Exh. C (Deposition of Domenico Ferraris* dated April 16, 1996) at 92–95. Thus, the June 20, 1991 Letter could not constitute a binding preliminary agreement.

*Quantum Meruit and Unjust Enrichment Claims*

■ In its claims for *quantum meruit* and unjust enrichment, Sevel seeks recompense for "a variety of benefits" conferred upon GM through "Sevel's perseverance with the C–10 program."[18] *Am. Compl.* ¶ 66. Sevel alleges that its "investments of time, money and effort in the ["C–10"] program were made in the reasonable expectation that it would be compensated in the end with profitable, long-term licenses to manufacture and distribute successor

18. Specifically, Sevel cites as the benefits conferred upon GM: "the re-establishment of a GM presence in Argentina, the re-introduction of the C–10 pick-up in the Argentine market, the maintenance of continuity during the period of transition to local production of C–20's and D–20"s (the diesel version of the

"C–20"), and even the performance of various studies and analyses which upon information and belief, GM later used in planning and negotiating its joint venture with CIADEA." *Am. Compl.* ¶ 66. The record is bereft of any evidence that GM used Sevel's studies and analyses in its relations with CIADEA.

vehicles." *Id.* ¶ *67; see also* ("massive investments"). However, under New York law, "[t]he existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi-contract for events arising out of the same subject matter." *Valley Juice Ltd., Inc. v. Evian Waters of France, Inc.*, 87 F.3d 604, 610 (2d Cir. 1996) (*quoting Clark–Fitzpatrick, Inc. v. Long Island R.R., Co.*, 70 N.Y.2d 382, 521 N.Y.S.2d 653, 516 N.E.2d 190, 193 (1987)). Since Sevel's quasi-contractual claims are based upon the same efforts and expenditures required to perform the 1984 Contracts, that same performance cannot give rise to a quasi-contract claim for *quantum meruit* and unjust enrichment.

## CONCLUSION

For the reasons set forth above, defendants' motion for summary judgment is granted. The Clerk of Court shall enter judgment for defendants and dismiss the action accordingly.

It is **SO ORDERED.**