**F I L E D**

**UNITED STATES COURT OF APPEALS**

September 8, 2006

**TENTH CIRCUIT**

CATV SERVICES, INC.,

      Plaintiff-Appellee,

      v.

ARGUSS COMMUNICATIONS, INC.,

      Defendant-Appellant.

No. 04-1448

(D. of Colo.)

D. C. No. 02-F-0879 (OES)

---

**ORDER AND JUDGMENT**[*]

---

Before **KELLY**, **PORFILIO,** and **TYMKOVICH**, Circuit Judges.

---

Defendant-Appellant Arguss Communications hired Plaintiff-Appellee CATV Services to liquidate leftover telecommunications equipment worth over $1 million. During the course of performance, Arguss sold some of the equipment on its own, despite a provision in the agreement that gave CATV the exclusive right to sell the equipment. CATV sued Arguss for breach of contract, claiming that Arguss failed to pay the commission on the sales.

---

[*] This order is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders; nevertheless, an order may be cited under the terms and conditions of 10th Cir. R. 36.3.

The case was tried to a jury, which found in favor of CATV on the primary breach of contract claim. During trial, the district court resolved three legal issues against Arguss: (1) a motion for judgment as a matter of law on the claims in CATV's favor, (2) a jury instruction on contract formation, and (3) a motion for a new trial. Arguss appeals these three rulings, but we AFFIRM.

## I. Background

Because this appeal comes to us after a jury verdict below, we state the facts in the light most favorable to the jury's decision. *See, e.g.*, *Macsenti v. Becker*, 237 F.3d 1223, 1242 (10th Cir. 2001); *United Phosphorus, Ltd. v. Midland Fumigant, Inc.*, 205 F.3d 1219, 1226 (10th Cir. 2000).

Arguss is a telecommunications contractor. In 1998, Arguss contracted with a predecessor of AT&T Broadband ("AT&T") to help with a telecommunications project AT&T was undertaking near Portland, Oregon. As part of this project, Arguss purchased equipment, using funds advanced by AT&T. By August 2000, however, AT&T decided to discontinue the project, so Arguss no longer needed a large quantity of unused equipment. Because AT&T had advanced the funds to purchase the equipment in the first place, Arguss wanted AT&T to take back the unused equipment. AT&T, on the other hand, wanted Arguss to sell it.

In the past, AT&T had used a company called CATV Services to resell equipment from prior projects and suggested Arguss hire CATV to sell the unused

-2-

equipment here. CATV was a telecommunications equipment broker. For years it had been hired by telecommunications contractors to resell used and new telecommunications equipment. CATV's customary practice was to work with the owner of the goods to prepare an inventory that would "define[] the equipment that [CATV would] have a right to sell on an exclusive basis." R. at 749–50. This inventory was important because it would be the basis of CATV's commission. CATV would then prepare the goods for sale, ship them to purchasers, collect the proceeds, and then remit 60% to the client within thirty days, keeping a 40% commission. CATV typically operated on an exclusive basis, wherein it, not the equipment owner, would sell the goods.

Based on AT&T's recommendation, Arguss decided to explore the possibility of working with CATV. The key players in the contract negotiations were Richard Richmond, president of CATV; Steve Burrows, Vice President of Arguss; and Randy Pierce, president of a construction company owned by Arguss.

Contract negotiations began in February 2001 and continued through April. At the outset of negotiations, Richmond explained to Burrows how CATV typically operated. Arguss raised several concerns, which were resolved during the negotiation process. Primarily, Arguss was concerned with the commission and the time for payment. Because Arguss's equipment was all new, CATV agreed to sell it at a 30% commission rather than its standard 40%. Also, CATV agreed to remit the balance within fifteen, rather than thirty, days.

Another big concern for Arguss was the term of performance. Arguss was paying thousands of dollars per month to rent space in Portland to warehouse the equipment. When Pierce and Burrows asked how quickly CATV could liquidate the goods, Richmond assured them it would probably take thirty to forty-five days. In the event that liquidation extended beyond that period, Richmond promised to ship the unsold equipment to his warehouse in Florida, where he would continue trying to sell the equipment. At trial, Burrows testified that this was his understanding as well—CATV "would take [any equipment that was not sold in the 30 to 45 days] into [its] warehouse and sell it from there." R. at 619.

As negotiations proceeded, the parties began to prepare for performance. On March 4, 2001, CATV employee Ross Hunter traveled to the Portland warehouse to assess the equipment CATV could end up selling. A month later, on April 4 or 5, Richmond advised Arguss he would send an inventory team to Portland the following Monday, April 9. Pierce testified that he would not have allowed workers on site if a deal had not been struck, and Burrows testified at one point that CATV and Arguss had reached a verbal agreement by this time. Richmond, however, testified that he sent the inventory team because he was confident that they would reach an agreement, although the terms had not yet been finalized. Burrows himself testified that as of April 4, they "had a verbal agreement where we were trying to go with this," but "the deal wasn't completed by any stretch of the imagination at this point." R. at 573.

-4-

On April 9 or 10, Richmond, Burrows, and Pierce finalized the agreement during a three-way telephone conversation. By that time, both parties agreed that a deal had been reached. However, one thing remained—Richmond told them he would send a one-page document, putting in writing the final terms of the deal. Pierce and Burrows said this was not a problem.

Richmond emailed the document to both Burrows and Pierce on April 11. Although Burrows acknowledged that he received the email, he did not "really recall" seeing the attached document. R. at 578. He claimed he probably did not pay much attention to it because it was prepared for Pierce's signature. Pierce acknowledged that he saw the email on his computer screen and knew it was from Richmond but insisted that he never opened the email, despite the fact that he knew Richmond would be sending a one-page document reflecting their agreement.

Later that day Richmond called Pierce to discuss the project. In that conversation, he told Pierce he "needed to execute the document and have it returned." R. at 764. Pierce responded, "I've looked it over. I don't have any problem. I'll get it signed and get it back to you." R. at 764. Richmond testified, "Once Mr. Pierce said he was going to sign and return the document, it was a done deal for me," even though he would never receive a signed copy of the contract. R. at 765.

The document attached to the email was entitled simply "Brokerage Sales Agreement." Richmond testified that this contract used the same boilerplate language as in all CATV contracts. Unlike CATV's other contracts, however, this document had been modified to include a 70-30 split of any proceeds (rather than the ususal 60-40 split), which would be remitted within fifteen days (rather than the usual thirty days). The contract further stated that the agreement was to run from April 15, 2001, through October 15, 2001. Most critical to this lawsuit, the contract included an "Exclusivity" clause, which stated: "CATV Services, Inc., for the term of this agreement has the *exclusive right to market* the materials defined as 'included' in [the inventory spreadsheet]." R. at 1480 (emphasis added).

### A. MediaCom Sale

From the outset, however, the course of performance was troubled. The first problem involved a sale of fiberoptic cable to a company called MediaCom. In May 2001, Richmond went to New York to sell fiberoptic cable. Eager to make a sale, Richmond called Burrows to make sure they would be able to ship the goods. Based on Burrows's affirmative reply, Richmond completed the sale. Subsequently, Burrows told Richmond that CATV was entitled only to the difference between the selling price of the cable and Arguss's purchase price. At the time, cable had been in demand and was selling for 130–150% of its original

-6-

value, so if CATV sold it at that rate, it could remit 100% of the original value to Arguss and still take its standard commission.

Unfortunately, before Arguss made this demand, Richmond had already agreed to sell the cable for less than the premium price. Because he had already promised the cable to MediaCom, Richmond was forced to ship the equipment to protect his credibility, and to do this, he had to promise to pay Arguss full value, rather than its usual 70%.

### B. CableCom Sale

Another transaction that caused problems was a sale that Arguss negotiated with a company called CableCom. Arguss had been negotiating this sale before hiring CATV to resell the equipment, although the sale was not completed until May 8, 2001. By the time the sale was completed, however, CATV had possession of the warehouse and equipment, so it inventoried, packaged, and marked the goods but did not pay freight. In this case, CableCom paid Arguss directly, and Arguss did not pay any commission to CATV.

### C. AT&T Sale

For several months, CATV continued to liquidate the goods, but by August, over 70% of the equipment remained at the warehouse. During this period, Arguss had continued negotiations with AT&T, which finally agreed to purchase the remaining equipment from Arguss. To facilitate the sale, Arguss needed information from CATV about the status of the Portland warehouse and the

equipment because CATV had control of the warehouse. Richmond said he was "running around in circles" to get the information Arguss needed to make the sale, and he told Arguss that he would claim a commission on any sale to AT&T. R. at 941.

On August 28, Richmond informed Arguss that the equipment was ready for shipment to AT&T and that CATV was awaiting shipping instructions. However, a few days later, Arguss evicted CATV from the Portland warehouse, so CATV was unable to ship the equipment to AT&T. Arguss completed the sale to AT&T but refused to give any commission to CATV.

\* \* \* \* \*

Based on these dealings, CATV sued Arguss for breach of contract. Arguss raised several counterclaims, and the case was tried to a jury. Arguss requested various instructions on contract formation, which the court refused to give. In the end, the jury concluded that Arguss did not owe commission on the CableCom sale, but it did owe commission on the MediaCom and AT&T sales. After trial, Arguss moved for judgment as a matter of law and for a new trial. Both motions were denied, and this appeal followed.

## II. Analysis

Arguss raises three arguments on appeal. First, it claims it was entitled to judgment as a matter of law. Second, it claims the district court erred by refusing to give requested jury instructions regarding contract formation. Finally, it claims

that evidence of jury confusion entitled it to a new trial. We reject each claim in turn.

### A. *Judgment as a Matter of Law*

#### 1. *Standard of Review*

We review de novo a motion for judgment as a matter of law, applying the same standard as the district court, and drawing all reasonable inferences in favor of the nonmoving party. *Miller v. Auto. Club of N.M., Inc.*, 420 F.3d 1098, 1131 (10th Cir. 2005). "Judgment as a matter of law is only appropriate when 'a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue.'" *Id.* (quoting Fed. R. Civ. P. 50(a)(1)). "Thus, a court may grant the motion only if the evidence points but one way and is susceptible to no reasonable inferences which may support the opposing party's position." *Id.* (citations and internal quotation marks omitted). Put otherwise, we ask, "Is there evidence in the record upon which the jury could have properly relied in returning a verdict for the nonmoving party?" *Klein v. Grynberg*, 44 F.3d 1497, 1506 (10th Cir. 1995). "A verdict is proper only if supported by more than a scintilla of evidence." *Id.*

#### 2. *Contract Formation*

At the heart of this case is the question of contract formation. When did the parties reach an agreement, and what were the terms of that agreement? Arguss insists that the parties' failure to agree on three material terms (necessity

of a written contract, term of performance, and exclusivity) precluded the formation of a contract as a matter of law. To the extent the parties reached an agreement, Arguss claims they did so verbally, prior to April 11, when Richmond sent Pierce the Brokerage Sales Agreement. Because the question of timing is necessary to a discussion of the other issues, we begin there.

The evidence to establish the precise moment of contract formation was hotly disputed by the parties. For example, at one point Burrows testified that they had reached a verbal agreement on April 4 or 5, when Richmond said he was sending a team over to the warehouse. At another point, however, he testified that by April 4, the parties "had a verbal agreement where we were trying to go with this," but "the deal wasn't completed by any stretch of the imagination at this point." R. at 573.

In any event, the evidence supports a conclusion that the parties did not reach a final agreement until Pierce accepted the terms Richmond sent him on April 11. It was undisputed that a day or two earlier, Richmond had informed Pierce and Burrows that a one-page, written agreement would follow. This agreement did follow, in the form of the Brokerage Sales Agreement sent via email on April 11. Both knew the document was coming, both admitted seeing the email, but both denied having paid any attention to the contract.

That same day, Richmond told Pierce that they "needed to execute the document and have it returned." R. at 764. Pierce responded, "I've looked it

over. I don't have any problem. I'll get it signed and get it back to you." R. at 764. Richmond testified, "Once Mr. Pierce said he was going to sign and return the document, it was a done deal for me," even though he would never receive a signed copy of the contract. R. at 765. Although these facts are not undisputed, a jury could have relied on this evidence to conclude that the parties finally reached an agreement at that time.

This view of the record obviates Arguss's claim that the parties could not be bound by a writing that followed an earlier, verbal agreement because, as a matter of fact, the agreement was not entered until the terms in the draft agreement were accepted. It also eliminates the need to consider how the draft agreement might have served as an offer to modify the contract. Under this view, there was no agreement until Pierce and Richmond agreed over the phone that the terms in the Brokerage Sales Agreement were acceptable.

### 3. Necessity of a Signed, Written Agreement

Arguss challenges this view on legal grounds, arguing that the undisputed facts of formation were so deficient that a binding agreement was never reached. In the first of these formation arguments, Arguss claims a verbal agreement was insufficient to bind the parties because Richmond manifested an intention not to be bound until a written document was executed. *See, e.g.*, *Club Eden Roc, Inc. v. Tripmasters, Inc.*, 471 So. 2d 1322, 1324 (Fla. Dist. Ct. App. 1985) ("Where the parties intend that there will be no binding contract until the negotiations are

-11-

reduced to a formal writing, there is no contract until that time."); *Am. Web Press, Inc. v. Harris Corp.*, 596 F. Supp. 1089, 1092 (D. Colo. 1983) (holding that where one party evidenced its intention to be bound only upon execution of a formal writing, a signed document was a condition precedent to contract formation).

We need not address the significance of Arguss's authority because the argument fails on factual grounds. The only evidence Arguss cites to support its claim is Richmond's statement to Pierce that, "regarding the contract, we need to get that signed and get it back to me." R. at 881. This statement, however, does not express intent to be bound only by a written agreement. To the contrary, Richmond testified that he believed the parties had made a verbal deal to work together. Moreover, as noted above, the jury could have relied on Richmond's testimony that "[o]nce Mr. Pierce said he was going to sign and return the document, it was a done deal for me." R. at 765. The jury could have concluded the signature was a mere formality in the shadow of an oral agreement to be bound by the terms in the document.

Perhaps the most important evidence of the parties' intent is the fact that both parties began performing on the contract in the absence of a written agreement. The fact that Richmond began performing based on an oral promise rather than waiting for a signed document would allow a jury to conclude it was not necessary to reduce the agreement to writing. Accordingly, a reasonable jury

could have properly found that neither party intended to be bound only by a signed writing.

### 4. Term of Performance

Arguss's remaining arguments dealing with contract formation rest on the principle that "[w]hen there is no mutual assent to a material term of a contract, rescission is the proper remedy." *Brush Creek Airport, L.L.C. v. Avion Park, L.L.C.*, 57 P.3d 738, 745 (Colo. App. 2002) (citing *Bejmuk v. Russell*, 734 P.2d 122 (Colo. App. 1986)). Specifically, Arguss argues that the term of performance and exclusivity were material terms for which there was no meeting of the minds and, therefore, no contract. However, the record contains sufficient evidence upon which a reasonable jury could have found a meeting of the minds on these points. We first address the term of performance.

The record is undisputed that Pierce and Burrows wanted the goods to be liquidated within thirty days and that Richmond emphatically stated his belief that they could liquidate the goods within thirty to forty-five days. Notwithstanding Arguss's initial preference, a jury could have found that through the course of negotiations, the parties agreed to a longer term. Most importantly, the Brokerage Sales Agreement made clear that the contract was for six months. Regardless of any preference for a shorter term, Pierce's assent to the terms of the agreement included assent to the six-month term.

Additionally, the jury heard Burrows and Pierce testify that the liquidation could take longer than thirty days. Specifically, Burrows told the jury that any equipment that "wasn't sold in the 30 to 45 days" would be taken to CATV's warehouse and sold from there. R. at 619. It would be natural for the jury to conclude that the marketing relationship would continue until the goods were liquidated, but if any goods remained past thirty days, Richmond would be responsible for marketing them from his Florida warehouse.[1]

Based on these facts, a jury could reasonably conclude that the parties agreed to a six-month term.

### 5. Agreement as to Exclusivity

Arguss further claims there was no binding agreement because the parties did not reach a meeting of the minds as to exclusivity. In support of this argument, Arguss cites cases such as *Iraola & CIA., S.A. v. Kimberly-Clark Corp.*, 325 F.3d 1274 (11th Cir. 2003), which held at summary judgment that an exclusivity clause was void for lack of a meeting of the minds where plaintiff witnesses testified inconsistently as to what discussions had transpired, and defense witnesses testified they would not have entered into the exclusivity clause at issue. Arguss emphasizes that the clause here was never discussed, and

---

[1] Although the liquidation was not completed within this time frame, the record reflects that the parties agreed it was not economical to ship the unsold equipment to Florida, so the parties agreed to keep the equipment in the Portland warehouse, and CATV would pay half the rent.

Burrows and Pierce both testified they never agreed to such a clause and would never have done so.

The jury, however, was not obligated to accept this testimony, and other record evidence supports a contrary view. Richmond testified CATV had exclusive rights to sell the goods. Pierce accepted the terms of the draft agreement, which gave CATV "the exclusive right to market the materials defined" in the joint inventory. R. at 764, 1480. In contrast to *Iraola*, a jury could rely on this fact to conclude that Pierce and Burrows overstated their position and that Pierce did, in fact, accept the exclusivity provision. Indeed, the jury likely disbelieved Pierce's testimony that he never opened the email containing the Brokerage Sales Agreement, especially when he knew a draft agreement was forthcoming. Under this view of the evidence, the jury would have concluded Arguss entered the agreement knowing an exclusivity clause was in place. It may be that the clause was ambiguous, as discussed below, but on this record, a jury could properly conclude that the parties agreed to be bound by this language.

Other aspects of the agreement, which are not in dispute, also support this view. First, for example, the agreement states: "The proceeds received from the sales of excess equipment will be divided on a Seventy/Thirty percent basis" without regard to who consummated the sale. R. at 1480. The contract also made clear that CATV "will be solely responsible for any testing and/or repair costs

-15-

deemed necessary by the Broker" and "will absorb all costs relating to the shipment and sale of all materials." *Id.* This clause does not distinguish between goods sold by Arguss and goods sold by CATV. If CATV was to be liable for all costs associated with the sales, it is reasonable to conclude it was entitled to all commissions associated with the sales.[2]

Second, the record supports a view that Arguss knew about the exclusivity requirement before the Brokerage Sales Agreement was sent. Several aspects of the trial testimony emphasized that this was an exclusive process. All witnesses agreed that the verified inventory was critical because it specified the scope of what CATV could sell for a commission. Other witnesses who had worked with CATV in the past confirmed that in their prior dealings, only CATV would sell the equipment on that inventory. It was undisputed that from the outset, Richmond explained the process to Burrows, and Burrows himself testified that he was familiar with the usual process. From this evidence, a jury could properly conclude that Arguss knew enough about the process to realize that CATV expected to sell the goods on an exclusive basis.

---

[2] Indeed, the costs of marketing the equipment were not insignificant. Richmond explained that marketing was a costly, involved process. CATV would purchase magazine advertisements and create an interactive CD that could be distributed to potential customers. Richmond testified, "I obviously wouldn't produce something of this nature with the expense incurred by my corporation had I believed the material could have simply been removed from my ability to sell it." R. at 861.

Finally, the course of conduct suggested a mutual understanding that CATV's right to sell was exclusive of Arguss. For one thing, Arguss forwarded to CATV the only inquiry it received.[3] During the course of performance, CATV had sole access to the warehouse and the inventory. Arguss could not have performed any sale it made without going through CATV. Indeed, in the final moments of the relationship, Arguss relied on CATV to provide it information about the goods to facilitate the sale back to AT&T.

In light of the Brokerage Sales Agreement, the evidence that Arguss knew how CATV operated, and the course of performance on the contract, a jury could properly conclude that Arguss understood the agreement gave CATV an exclusive right to sell the equipment.

### 6. Exclusivity and Ambiguity

In addition to these questions challenging contract formation, Arguss raises two issues that go to contract interpretation. It first argues that if the exclusivity provision applies, it should have been construed against the drafter, CATV, because it was ambiguous. Under this reading, the provision would mean that Arguss could not hire other brokers, not that Arguss itself could not sell its own goods. While Arguss is right as a matter of contract interpretation, the

---

[3] Only one purchaser contacted Arguss about purchasing equipment, and it was undisputed at trial that Arguss directed this buyer to CATV to handle the sale.

significance of the provision was an issue of fact that was properly resolved by the jury.

The fact that the contract was ambiguous does not mean we must accept Arguss's interpretation. It is true that ambiguities should be resolved against the drafter. *Holiday Homes of St. John, Inc. v. Lockhart*, 678 F.2d 1176, 1186 (3d Cir. 1982); *see also Nicholas v. Bursley*, 119 So. 2d 722, 728 (Fla. Dist. Ct. App. 1960) ("[I]t is a general rule that a contract will be construed against the party who drew it or chose the language and any ambiguity will be construed strongly against the party making use of such language."). But from this legal principle it does not follow as a matter of law that the term cannot mean what the drafter says it means: "the interpretation of the terms of a particular contract is, being a matter of fact, primarily within the province of the district court." *Holiday Homes*, 678 F.2d at 1183. We have likewise stated, "once a contract is determined to be ambiguous, the meaning of its terms is generally an issue of fact to be determined in the same manner as other disputed factual issues." *Anderson v. Eby*, 998 F.2d 858, 865 (10th Cir. 1993) (applying Colorado law).

Here, the jury heard testimony that would allow it to find that the parties understood Arguss would not have the right to sell the equipment on the joint inventory. The same evidence that supports a meeting of the minds on this issue supports a finding that both parties understood that this provision gave CATV an exclusive right to sell the equipment, even to the exclusion of Arguss itself.

### 7. *Applicability of Contract to Sale of Fiberoptic Cable*

Arguss's final breach of contract claim regards the sale of fiberoptic cable to MediaCom. Arguss claims this cable was different from the other items CATV was selling, so CATV owed 100% of the value of the cable, rather than the usual 70%. Because there was no contractual basis for distinguishing cable from the rest of the inventory, a reasonable jury could properly conclude that CATV was entitled to a 30% commission.

Arguss claims it informed CATV during the course of negotiations that since fiberoptic cable was selling for a premium, CATV was required to remit 100% of the cable's value. Around that time, cable was selling for rates as high as 130–150% of its value. At these rates, CATV should have been able to remit 100% of the value and still receive its usual commission.

The problem with Arguss's logic is that it is not supported by the Brokerage Sales Agreement, which specified that *all* proceeds would be split 70/30. Arguss's claim would bear out only if fiberoptic cable was not part of the verified inventory, a point Arguss has never maintained. To the contrary, Arguss admits the cable was stored at the same warehouse where CATV had exclusive control. Nothing in the record distinguishes fiberoptic cable from any other goods in the inventory.

Arguss also maintains that Richmond knew before he sold the cable that it was different from the rest of the inventory. Richmond squarely rejected this

view, testifying that he learned about Arguss's demands only after he had already promised to sell the cable to MediaCom at the going rate. He testified that he only acquiesced to Arguss's demand to remit 100% of the value because he had already promised the cable to MediaCom at a certain price and had to maintain the business relationship. Richmond went forward with the deal, not because he agreed to the terms, but because he had already committed to MediaCom and his reputation was on the line.

On this record, a reasonable jury could find that CATV acquiesced to remit the full value of the cable only because it believed it had no other choice, although it was not contractually obligated to do so.

* * * * *

For these reasons, we conclude the district court did not err in denying Arguss's motion for judgment as a matter of law. A reasonable jury could have concluded there was no meeting of the minds until Pierce told Richmond the Brokerage Sales Agreement was acceptable. Such agreement would encompass acceptance of all the document's terms, including exclusivity and term of performance, and could begin without a signed writing. Because nothing in the document distinguished fiberoptic cable from other goods, proceeds from the sale to MediaCom should have been distributed at the contract rate. Accordingly, we affirm.

**B. Jury Instructions**

Arguss next claims the district court erroneously refused to instruct the jury on contract formation principles by denying four of its requested instructions. We find the instructions as a whole to be adequate and affirm on this issue.

We review the failure to tender a proposed jury instruction for abuse of discretion, and review de novo "whether the instructions as a whole adequately apprised the jury of the issues and the governing law." *United States v. Wolny*, 133 F.3d 758, 765 (10th Cir. 1998). "Even if the district court erred, we will affirm as long as the error is harmless in the context of the trial as a whole." *World Wide Ass'n of Specialty Programs v. Pure, Inc.*, 450 F.3d 1132, 1139 (10th Cir. 2006). "The error is harmless when the erroneous instruction could not have changed the result of the case." *Lusby v. T.G.&Y. Stores, Inc.*, 796 F.2d 1307, 1310 (10th Cir. 1986).

Here, the district court refused to give Arguss's Proposed Instructions 17–20. These instructions would have taught the jury about offer, acceptance, consideration, and mutual agreement to specified terms. For the most part, this information was not particularly technical and comported with the common usage of these notions. Proposed Instruction 17 would have instructed jurors that "[e]ach party to the contract must have understood and agreed to the essential terms of the claimed contract." R. at 104. Proposed Instruction 20 would have told the jury, "When parties to a contract attach different meanings to a material

term of the contract, no meeting of the minds has occurred, and there is no valid contract." R. at 107.

Instead, the district court gave the following guidance in Instruction 12:

In order for the plaintiff to establish its claim of breach of contract, it has the burden of proving the following essential elements by a preponderance of the evidence:

1. The defendant entered into a contract with the plaintiff to sell equipment owned by the defendant in Portland, Oregon, and this contract (1) gave the plaintiff the exclusive right to sell the equipment, (2) provided for a division of sale proceeds 70 percent to the defendant and 30 percent to the plaintiff in all cases, regardless of who sold the equipment, and (3) required the plaintiff to pay the costs of performing an inventory and shipping;

2. The defendant failed to honor the contract terms set forth above; and

3. The plaintiff substantially performed its part of the contract or the plaintiff was excused from performance.

R. at 170.

It may be that the court did not walk the jurors through contract formation step by step. However, the specific findings required by Instruction 12 ensured that the jury would find the necessary offer, acceptance, and consideration. Arguss, moreover, did not object to Instruction 2, which told the jury an "agreement" had been reached, and that Arguss "asserts that the parties entered into an oral agreement that did not contain the terms that the plaintiff claims." Instruction 13 also told the jury that it could look at the course of conduct between the parties in determining the meaning of the contract.

Arguss argues that the parties failed to agree on three material terms: (1) necessity of a writing, (2) term of performance, and (3) exclusivity. We disagree. For example, Instruction 12 adequately apprised the jury of the need to find an agreement (or meeting of the minds) on the key terms of the contract, and the trial testimony exhaustively debated these points. The jury resolved the debate over the contract terms in favor of CATV. While perhaps additional instructions could have been helpful, we look to the instructions "as a whole," and as long as the instruction "adequately states the law, the refusal to give a particular instruction is not an abuse of discretion." *McKenzie v. Benton*, 388 F.3d 1342, 1348 (10th Cir. 2004).

It is true that Instruction 12 does not specifically require the jury to find a meeting of the minds on whether the contract had to be reduced to a signed writing, or how long CATV had to perform. But any omission in this regard is harmless because an adverse finding on these issues was inherent in an adverse finding on exclusivity. The primary evidence that would support a finding of exclusivity was the Brokerage Sales Agreement. Thus, a finding of exclusivity entails a finding that the parties agreed to the terms of the draft agreement, which includes a finding of a six-month term and an intent to be bound in the absence of a signed writing. In this way, any error was harmless.

### C. Motion for a New Trial

Arguss's final argument is that the district court erred in denying its motion for a new trial. In general, such a ruling is discretionary and should only be

reversed where "the trial court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances." *Weese v. Schukman*, 98 F.3d 542, 549 (10th Cir. 1996). However, where a jury verdict "is inconsistent, indicating either confusion or abuse on the jury's part, a motion for a new trial is not discretionary and a new trial must be granted." *Global Van Lines, Inc. v. Nebeker*, 541 F.2d 865, 868 (10th Cir. 1976). Similarly, a new trial is appropriate where "it is patent from the instructions that the jury's award disregards the court's clear direction." *Chicago, R. I. & P. R. Co. v. Speth*, 404 F.2d 291, 295 n.4 (8th Cir. 1968).

Arguss makes three points that it claims require a new trial. First, it claims the verdict was inconsistent. On the one hand, the jury found in favor of CATV on the AT&T sale (which entailed a finding of exclusivity) and ruled in favor of Arguss on the CableCom sale (which presumably entailed a finding of non-exclusivity).

But this is not the only reasonable view of the facts. The negotiations of this arrangement occurred before the agreement was formed. The record also establishes that CATV was obligated to pay for shipping in order to receive the commission, and it was undisputed at trial that CATV did not pay for shipping on the CableCom sale. This fact could have been a basis for the jury to find that CATV was not obligated to pay commission on the CableCom transaction.

In response to this analysis, Arguss points out that failure to pay shipping costs does not resolve the inconsistency because CATV did not pay shipping costs

on the AT&T sale either.  However, prior to that sale, Arguss had forced CATV out of the warehouse, preventing it from performing under the contract, which by its terms continued through October 15, 2001.  On these facts, we cannot find that the verdict was so inconsistent as to require the district court to exercise its discretion to grant a new trial.

Second, Arguss claims that jury polling made clear the jury was confused.  When the jury was polled, one juror asked, "Yes or no.  One word?"  R. at 1214.  The court told him he had to choose, and the juror said, "Yes."  *Id.*  Arguss argues that this colloquy demonstrates the juror's reservation about the jury verdict.  However, if the juror had reservations at some point, we can only assume he resolved them before affirming the verdict to the court.

Finally, Arguss claims the jury ignored Instruction 13[4] and the "undisputed and unimpeached testimony . . . that CATV and Arguss did not in any way discuss the exclusivity clause at issue, and that Arguss never agreed to that clause and, indeed, would not have agreed to that clause."  Aplt. Br. at 55.  We have

[4] This instruction reads as follows:

The statements or conduct of the parties before any dispute arose between them is an indication of what the parties intended at the time that the contract was formed.  To determine what the parties intended the terms of the contract to mean, you may also consider the parties' negotiations of the contract, any earlier dealings between the parties, any reasonable expectations the parties may have had because of the promises or conduct of the other party, and any other facts and circumstances that existed at the time that the contract was formed.

R. at 199.

already explained how the jury could have viewed the testimony regarding the negotiations and contract formation consistent with its verdict. Because none of these reasons required the district court to grant the motion for a new trial, we cannot say the district court abused its discretion in denying the motion.

### III. Conclusion

For these reasons, we AFFIRM.

Entered for the Court.


Timothy M. Tymkovich
Circuit Judge